# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-4362

AUTOMOBILE MECHANICS LOCAL 701
WELFARE AND PENSION FUNDS,

*Plaintiff-Appellant,*

*v.*

VANGUARD CAR RENTAL USA, INC. d/b/a
NATIONAL CAR RENTAL & ALAMO,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 1719—**Charles R. Norgle, Sr.**, *Judge.*

ARGUED MAY 21, 2007—DECIDED SEPTEMBER 18, 2007

Before RIPPLE, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* The Automobile Mechanics Local 701 Welfare and Pension Funds ("the Funds") administer welfare and pension benefits for the members of Local 701. As part of its collective bargaining agreement ("CBA") with the union, Vanguard Car Rental USA d/b/a National Car Rental and Alamo ("Vanguard"), through its predecessor in interest, agreed to make weekly payments to the Funds for the benefit of each regular employee covered by the CBA. Vanguard does not deny this obligation, and it has not refused to make payments during the period in which this dispute has occurred. It is the contri-

bution rate instead that is the bone of contention here. The Funds take the position that Vanguard was required to pay the increased contribution rate authorized by the Funds' Board of Trustees and made effective on August 1, 2005; Vanguard says that it owes only the last rate authorized in the CBA. To recoup the monies allegedly due, the Funds filed suit in federal court under § 502 of the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, on March 29, 2006, arguing that certain agreements signed between Vanguard and the Funds gave the Board of Trustees the authority to raise the contribution rates. The parties filed cross-motions for summary judgment. Rather than addressing those motions, however, the district court dismissed the suit *sua sponte*, because it concluded that the dispute had to be arbitrated.

We agree with both parties that this dismissal by the district court was improper. Enforcement of a forum selection clause (including an arbitration clause) is not jurisdictional; it is a waivable defense that Vanguard, in fact, waived. Although the district court did not address the summary judgment motions, they are properly before this court. Because the dispositive issue is one of contract interpretation, our review is *de novo*, and nothing prevents us from addressing this lone question, we hold that Vanguard is entitled to summary judgment. The agreements do not give the Funds the authority to raise the contribution rates until a "renewed term" has been ushered in by the signing of a new CBA.

**I**

The facts underlying this case are not in dispute. On June 23, 2003, Vanguard's predecessor in interest entered into a CBA with Local 701. That CBA expired on April 25, 2004. It obligated Vanguard to pay money into the Local's

pension and welfare funds on behalf of its employees. Article 7 of the CBA, which deals with welfare benefits, provided:

> The Employer shall pay the sum of $124 per week for each regular employee covered by this Agreement who performs any work in such week into the Automobile Mechanics Union Local 701 Union & Industry Welfare Fund for the payment of health and welfare benefits as determined by the Board of Trustees. . . . The Fund shall in all respects be administered in accordance with the Trust Agreement drawn.

Referring to welfare benefits, Article 7(D) adds that "[t]he obligation to make the above contribution shall continue during periods when the collective bargaining agreement is being negotiated . . . ." Article 8, the provision for the Pension Fund, is similar: "The Employer shall be obligated to contribute the sum of $48.00 per week for each employee covered by this [A]greement to the Pension Fund of the Automobile Mechanics Union Local 701. . . . The Fund shall in all respects be administered in accordance with the Trust Agreement drawn." Both Article 7(D) and Article 8(D) obligate Vanguard to make the contribution "during periods when the collective bargaining agreement is being negotiated . . . ."

Following the expiration of the CBA on April 2, 2004, the parties entered into extension agreements that prolonged the CBA through January 2, 2005. While the parties have not extended the term of the CBA further since that date, they have continued to operate under its terms during this "status quo" period as provided by Articles 7(D) and 8(D).

On June 23, 2004, the same date that Vanguard signed the CBA with the Union, it also entered into participation agreements with the Pension Fund and the Welfare Fund. Two sections of these agreements are relevant here. (A

separate agreement was signed with each fund, but they conform in almost every respect. We quote from the agreement with the Welfare Fund.) Paragraph 5 deals with the automatic renewal of the participation agreement:

> This Agreement shall remain in full force and effect for the full term of the current Collective Bargaining Agreement between the Employer or area wide Employers and the Union and shall be automatically renewed from time to time for terms coterminous with those of the aforementioned Collective Bargaining Agreements. The rate at which contributions are to be made during any renewed term shall be that set by the Board of Trustees.

Paragraph 8 addresses the termination of the agreement by the Employer:

> An Employer desiring to terminate this Agreement must notify the Fund Office sixty (60) days' [sic] prior to the termination date of the existing Collective Bargaining Agreement. If the Employer fails to give timely notice to the Trustees the Employer shall be bound to the provisions of this Agreement for the period of the next Collective Bargaining Agreement and thereafter until proper notice is given but in no event less than three years unless terminated by the Trustees. The rate at which contributions are to be made during any renewed term shall be that set by the Board of Trustees.

On August 1, 2005, the Board of Trustees of the Funds informed Vanguard that the contribution rates had been increased to $155 for the Welfare Fund and to $59 for the Pension Fund. Although Vanguard has continued to pay the $124 and $48 per week rates that it paid prior to August 1, it has refused to contribute at the increased rate. As a result, the Funds filed this suit, alleging a violation of ERISA, seeking an accounting, and requesting

a judgment and an injunction requiring Vanguard to pay the increased contribution rates.

Vanguard filed a motion for summary judgment on June 28, 2006, and the Funds did the same on August 11, 2006. Rather than addressing those motions, however, the district court seized upon the arbitration clause in Article 18 of the CBA signed between the union (which is not a party to this case) and the Funds. Noting the national policy in favor of arbitration and finding the dispute to be within the terms of Article 18A of the CBA, the district court dismissed the suit, citing FED. R. CIV. P. 12(b)(3) (improper venue). The Funds brought this timely appeal.

## II

### A. Right of Action

Vanguard argues that we lack subject-matter jurisdiction over the Funds' suit. That cannot be right, unless the suit is so frivolous that it does not engage the power of the court. See *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 89 (1998), citing *Bell v. Hood*, 327 U.S. 678, 682-83 (1946). It is possible, however, that these parties might not have a right of action under the statute; if so, their suit is barred at the threshold. Two provisions of ERISA, §§ 502 and 515, 29 U.S.C. §§ 1132 and 1145, are relevant here. Section 1145 supplies the substantive right that the Funds seek to enforce:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

Section 1132(e) complements § 1145 by authorizing certain parties to enforce the substantive right. It empowers

various parties to bring actions under ERISA, including the Secretary of Labor or a participant, beneficiary, or fiduciary of a plan. The plaintiff Funds are employee benefit plans, to which § 1132(d)(1) gives the right to "sue or be sued under [ERISA] as an entity." We have found that such employee benefit plans may bring suit in federal court under § 1332(e). See *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mutual Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983); see also *Laborers' Pension Fund v. Blackmore Sewer Construction, Inc.*, 298 F.3d 600 (7th Cir. 2002) (affirming result in suit brought by fund for unpaid monies under § 1145 where claim was alleged under § 1132); *Central States Southeast and Southwest Areas Pension Fund v. Kroger Co.*, 226 F.3d 903 (7th Cir. 2000) (same).

Notwithstanding this apparent source of authority to sue, Vanguard submits that the Funds' action has been foreclosed by *Laborers Health & Welfare Trust Fund for Northern California v. Advanced Lightweight Concrete Co., Inc.*, 484 U.S. 539 (1988). There, an employees' trust fund wanted to bring an action under § 515 of ERISA to recover contributions to employee benefit plans that the employer refused to pay after the expiration of the CBA that governed the contributions. The duty to continue making post-contract contributions during a status quo period that the trust fund sought to enforce derives from the duty to bargain in good faith under § 8(a)(5) of the National Labor Relations Act: "The duty to bargain and to refrain from instituting unilateral changes in wages and working conditions under section 8(a)(5) normally outlives the parties' CBA. An employer is required to 'maintain the status quo after the expiration of a collective bargaining agreement until a new agreement is reached or until the parties bargain in good faith to impasse.'" *General Service Employees Union v. NLRB*, 230 F.3d 909, 913 (7th Cir. 2000) (quoting *NLRB v. Emsing's Supermarket*, 872 F.2d

1279, 1285 (7th Cir. 1989) (quotations omitted)); see also *NLRB v. Katz*, 369 U.S. 736 (1962). In *Advanced Lightweight Concrete*, the Supreme Court held that § 515 does not give rise to any federal right to have an employer make post-contract contributions while negotiations are ongoing; the question there was whether a charge that a refusal to make pension contributions during a status quo period violated the NLRA was exclusively within the jurisdiction of the National Labor Relations Board. See 484 U.S. at 546-48.

Questions involving an employer's "promised obligations" to a employee benefit plan—that is, their obligations "under the terms of the plan or under the terms of a collectively bargained agreement"—are not excluded from scope of the statute, nor are they matters within the exclusive jurisdiction of the NLRB. Unlike the plaintiff trust fund in *Advanced Lightweight Concrete*, the Funds here do not rely on any alleged statutory duty Vanguard might have to continue contributing during the post-contract status quo period. Instead, the Funds claim only that Vanguard has violated a contractual duty stemming from the participation agreements. Because this contract relates to a welfare benefit plan governed by ERISA, the lawsuit falls within the federal question jurisdiction of the court.

## B.  Forum Selection Clause

To everyone's surprise, the district court dismissed this case for improper venue, based on the existence of the arbitration clause. It raised that issue on its own and resolved the case on this basis without any briefing from the parties. Stranger yet, it did so after Vanguard had already waived whatever right to arbitration it might have had. We review the district court's dismissal of the case on this ground *de novo*. See *Continental Casualty Co.*

*v. American National Ins. Co.*, 417 F.3d 727, 733 (7th Cir. 2005). Both parties submit that the dismissal was improper.

It is not entirely clear whether a motion seeking dismissal based on a forum selection clause, including an arbitration clause, is better conceptualized as an objection to venue, and hence properly raised under Rule 12(b)(3), or as a failure to state a claim, and thus properly raised under Rule 12(b)(6). See generally 5B Charles A. Wright and Arthur R. Miller, *Federal Practice & Procedure* § 1352 at 318-19 (3d ed. 2004). Wright and Miller observe, however, that "most of the decided cases use [Rule 12(b)(3)] as the basis" for deciding such a motion. *Id.* at 319. This court has followed the majority rule. See *Continental Ins. Co. v. M/V Orsula*, 354 F.3d 603, 606-07 (7th Cir. 2003). This is consistent with our view that the choice of an arbitral forum can be waived early in the proceedings, and generally is waived once the party who later wants arbitration chooses a judicial forum. See *Grumhaus v. Comerica, Inc.*, 223 F.3d 648, 650-51 (7th Cir. 2000); *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 390 (7th Cir. 1995).

Venue is primarily a "matter of convenience of litigants and witnesses." *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 990 (7th Cir. 2001) (quoting *Denver & Rio Grande W. R.R. Co. v. Brotherhood of R.R. Trainmen*, 387 U.S. 556, 560 (1967)) (citations omitted). As a result, an objection to venue "can be waived or forfeited.*" American Patriot Ins. Agency, Inc. v. Mutual Risk Management, Ltd.*, 364 F.3d 884, 887 (7th Cir. 2004); see also 14D Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, *Federal Practice & Procedure* § 3826 (3d ed. 1998). Indeed, FED. R. CIV. P. 12(h)(1) provides that improper venue is waived as a ground of dismissal when not timely raised. Forum selection clauses are similar; they represent an *ex ante*

determination by the parties themselves of the place that will be the most convenient for any litigation that may come along. Arbitration clauses, the Supreme Court has held, are a species of forum selection clause. See *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533-34 (1995).

District courts should not, as a matter of general practice, dismiss *sua sponte* either for improper venue or for failure to follow a forum selection clause. See 14D Wright, Miller, and Cooper, *Fed. Prac. & Proc.* § 3826 ("[B]ecause of the waiver principle and the personal nature of the defense, it generally (but not always) is thought inappropriate for the district court to dismiss an action on its own motion for improper venue if there has been no objection from the party for whose benefit the privilege exists."). In the analogous area of venue, our sister circuits have found *sua sponte* dismissal to be appropriate only under limited circumstances. See *Algodonera de las Cabezas, S.A. v. American Suisse Capital, Inc.*, 432 F.3d 1343, 1345-46 (11th Cir. 2005) (holding that district court must give parties the opportunity to present views, including willingness to waive venue, before dismissing); *Janis v. Ashcroft*, 348 F.3d 491, 493 (6th Cir. 2003) (holding that *sua sponte* dismissal is inappropriate); *Gomez v. USAA Federal Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999) (holding *sua sponte* dismissal to be appropriate only when extraordinary circumstances favor allowing the question to be raised on the court's own motion); *Stjernholm v. Peterson*, 83 F.3d 347, 349 (10th Cir. 1996) (holding that *sua sponte* dismissal not allowed after waiver under FED. R. CIV. P. 12(h)(1)); *Costlow v. Weeks*, 790 F.2d 1486, 1488 (9th Cir. 1986) (holding that *sua sponte* dismissal is appropriate only where no responsive pleading has yet been filed).

Dismissal on the court's own initiative is particularly ill-conceived as an effort to enforce a contractual arbitra-

tion clause. The district court thought that the arbitration clause cut the other way. It commented that "because the parties have previously agreed to arbitration, they should not now be allowed to turn their back on that agreement, in favor of litigation in the federal court." This assumes, of course, that the parties who are before the court are the ones who have agreed to arbitrate their disputes. The district court apparently took no notice of the fact that the participation agreements between Vanguard and the Funds do not contain arbitration agreements; the arbitration agreement is in the CBA between Vanguard and Local 701. Arbitration, the Supreme Court constantly reminds us, is a creature of agreement. See, *e.g.*, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942-43 (1995). The court was thus mistaken when it assumed that the dispute before it was covered by an arbitration agreement.

Even if the agreement to arbitrate between the employer and the union somehow carried over to the Funds, and we do not see how it could, there is another problem with the court's conclusion. Like many other contractual rights, "[a] contractual right to arbitrate may be waived, either expressly or implicitly." *Grumhaus v. Comerica Securities, Inc.*, 223 F.3d 648, 650 (7th Cir. 2000). As they may do with other contractual clauses, litigants may turn their back on their right to enforce an agreement to arbitrate. The district court offered no reason why it had either the right or the duty to reject such a waiver. In all of the cases it cited in support of its dismissal, one party had moved to enforce the arbitration agreement and dismiss for lack of venue.

Undoubtedly, the reason why Vanguard did not file any motion asserting a right to arbitrate is because it had no right under its agreements with the Funds. Had it wished to do so, however, it had ample opportunity. It filed a response to the complaint in which it did not deny

plaintiffs' allegation that venue was proper in the Northern District of Illinois, saying instead that "[d]efendant neither admits nor denies the allegations and legal conclusions concerning venue, for lack of sufficient information." Although it made no motion to dismiss, Vanguard's motion for summary judgment, which said nothing about venue or arbitration, was an implicit waiver of any argument for dismissing on either of those grounds. Finally, before this court Vanguard has explicitly waived the forum selection clause as a defense. We too conclude that this was not an appropriate ground on which to dismiss this case.

## III

The question remains what we should do at this point. One option is to remand the case for further proceedings before the district court, and the other is to decide the cross-motions for summary judgment as a matter of first impression. Federal courts of appeals have the authority under 28 U.S.C. § 2106 to provide relief when so doing would "be just under the circumstances." This includes the prerogative to decide motions for summary judgment as a matter of first impression. See *Swaback v. American Information Technologies Corp.*, 103 F.3d 535, 544 (7th Cir. 1996). Nonetheless, "[i]n most instances . . . such a decision is best made by the district court; we would rarely find it appropriate to direct the entry of summary judgment." *International Financial Services Corp. v. Chromas Technologies Canada, Inc.*, 356 F.3d 731, 740 (7th Cir. 2004) (quoting *Turner v. J.V.D.B. Assocs., Inc.*, 330 F.3d 991, 998 (7th Cir. 2003)).

"Rarely" does not mean "never," though. This case is unlike either *International Financial Services* or *Turner*. In the former, we remanded the case to the district court based on our conclusion that "[w]hether veil-piercing is

appropriate depends on a host of considerations that this court is ill-positioned to weigh as a matter of first impression." 356 F.3d at 740. In contrast, a decision about the meaning of a provision in a contractual agreement between two parties is precisely the type of legal question with which appellate courts commonly deal. Moreover, we have no qualms about the state of the record, which was the problem in *Turner*. The motions before us were fully briefed, there are no disputed material facts, and all relevant documents are before this court. Remanding this case to the district court would therefore not accomplish anything useful. See *Swaback*, 103 F.3d at 544 (directing the district court to enter summary judgment on the ground that "this case presents no genuine issue of material fact, and both parties have briefed and responded to the cross-motions for summary judgment, and . . . substantial further proceedings in the district court would be an inefficient use of judicial resources").

We review the cross-motions for summary judgment under the same standard as we would had the district court addressed them, "construing all facts, and drawing all reasonable inferences from those facts, in favor of . . . the non-moving party." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 352 (7th Cir. 2002). Although the parties have not stipulated to the facts, there are essentially no disputed facts. The only quarrel revolves around the meaning of the participation agreements. As a result, we need decide only whether either party "is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

If the participation agreements obligate Vanguard to contribute at the increased rate, then the Funds are entitled to judgment; if not, then Vanguard should prevail. As a matter of ERISA law, the obligations enforceable under § 1145 include those "under the terms of [an employee benefit] plan or under the terms of a collectively bargained agreement," and the contributions agreed to

thereunder shall be made "in accordance with the terms and conditions of such plan or such agreement." As the quoted language suggests, these obligations may stem from an agreement other than the CBA. In fact, it is not even necessary that a CBA exist for an employer to incur such obligations. See *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148, 1153 (7th Cir. 1989) (*en banc*) ("Whether or not the plans are obligated to Gerber Truck's workers, nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement . . . ."). A participation agreement is thus one potential source of a contribution obligation.

As we noted at the outset, the dispute here is a narrow one: how much does Vanguard have to pay the Funds during the status quo, post-contractual period? There are only two options: the old amount of money established by the expired CBA, or any new amount of money the Funds decide to authorize. The Board of Trustees of the Funds is the body that sets contribution rates. Paragraphs 5 and 8 of the participation agreement provide as follows: "The rate at which contributions are to be made during any renewed term shall be that set by the Board of Trustees." The question thus can be narrowed further to the meaning of the term "renewed term," and whether the period following the expiration of one CBA and prior to the signing of a new CBA (the status quo period) qualifies as a "renewed term."

Two paragraphs in each agreement are relevant to our resolution of that question: ¶ 5, which discusses automatic renewal, and ¶ 8, which covers termination of the agreement. Paragraph 5 ties the term of the agreement to the term of the CBA, providing that it will be "automatically renewed from time to time for terms coterminous with those of the aforementioned Collective Bargaining Agreements." Paragraph 8 similarly uses the CBA as the

benchmark for termination, requiring a terminating employer to notify the fund "sixty (60) days' [sic] prior to the termination date of the existing Collective Bargaining Agreement." A failure to give timely notice results in the extension of the participation agreement: "If the Employer fails to give timely notice to the Trustees, the Employer shall be bound to the provisions of this Agreement for the period of the next Collective Bargaining Agreement and thereafter until proper notice is given but in no event less than three years unless terminated by the Trustees."

The Funds argue that a "renewed term," during which the Board of Trustees is free to set new contribution rates on its own, commences with the lapsing of the prior CBA. In advancing their reading of the agreement, the Funds divorce the adoption of a new CBA from the automatic renewal of the agreements. There is, after all, no explicit language in ¶ 5 tying automatic renewal of the agreement to the conclusion of a new CBA. The terms of each are merely made coterminous. There is thus no necessary link between the automatic renewal of the contribution obligation and the entry of a new CBA into force. The Funds argue that this point becomes clear upon examination of ¶ 8, which provides that an employer who fails to give proper notification of its desire to terminate could be bound to the provisions of the agreement for three years, even if no new CBA was *ever* signed. The Funds claim that such a period would be a renewed term, in spite of the fact that there is no replacement CBA. This means, they conclude, that a "renewed" term commences with the lapsing of the term of the last CBA. If that is true, then the Board of Trustees has the power to fix new contribution rates unilaterally as soon as the old CBA expires.

In contrast, Vanguard focuses on the language in ¶ 5 that provides for automatic renewal of the agreement "for terms coterminous with the CBA." This language, it argues, indicates that a renewed term is triggered by the

adoption of a new CBA. This tie between the adoption of a new CBA and the renewal of the agreement for a new term is reiterated in ¶ 8, which binds the employer to the terms of the agreement for the period of the next CBA, in the event that the employer fails to give proper notice that it wishes to terminate the agreement.

While the contract is not the most artfully drafted document we have ever seen, it is nonetheless possible to interpret it without recourse to any extrinsic materials. For several reasons, we conclude that, as drafted, the "status quo" period is not part of a "renewed term." First, the Funds offer no explanation for how a renewed term could be coterminous with a new CBA if the renewed term does not begin at the same time as the CBA. In order for that portion of the agreement to have any meaning at all, the renewed term must be triggered by the passage of the new CBA. Second, the fact that failure to give notice means that an agreement cannot be terminated for three years even if no new CBA is ever passed does not compel the conclusion that the term following the expiration of the old CBA is a renewed term. Paragraph 8 never identifies this period as a "renewed term." It simply reiterates that during a renewed term, the Trustees may set the rates. (That paragraph's reference to "the period of the next [CBA]" is, in contrast, probably a reference to the renewed term.) The multiple references to the synchronicity of the periods of the CBA and renewed participation agreement point only one way: until there is a new CBA, the contribution rates must remain at the status quo level, which is to say at the level stipulated in the expired CBA. Had the Funds wished to protect themselves against the economic risk of being stuck with below-market contributions during a status quo period, they should have insisted on different terms in the agreement.

Since there was no renewed term, the Board of Trustees had no authority to set new contribution rates and Vanguard has no obligation to pay them. As a result, summary judgment should be granted in Vanguard's favor.

*   *   *

The decision of the district court is REVERSED. We direct the district court to enter judgment in favor of Vanguard.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*