In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 07-1784

CPL, INCORPORATED,

*Plaintiff-Appellant,*

*v.*

FRAGCHEM CORPORATION,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06-C-1352—**Charles R. Norgle, Sr.**, *Judge.*

---

ARGUED DECEMBER 5, 2007—DECIDED JANUARY 9, 2008

---

Before FLAUM, EVANS, WILLIAMS, *Circuit Judges.*

FLAUM, *Circuit Judge.* CPL and Fragchem do business in the chemicals industry, but their commercial chemistry is now questionable. The two companies began their relationship under an exclusive Supply Agreement, terminated this agreement years later, and then resumed conducting transactions soon thereafter. In April of 2004, Fragchem received a shipment of chemicals from CPL but refused to submit payment. CPL filed a complaint with the district court, and Fragchem responded by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(7) for failure to join a necessary party. Instead of deciding this motion on the merits, the district court dismissed the lawsuit *sua sponte* on the basis of

improper venue on the grounds that the Supply Agreement between the two parties contained an agreement to arbitrate. For the reasons set forth in this opinion, we reverse the ruling of the district court.

## I. Background

CPL is a corporation engaged in the sale of chemicals used in the manufacture of generic pharmaceutical products. It is organized under the laws of Missouri, with its principal place of business in Gaithersburg, Maryland. Its parent company, Cadila, is registered under the Indian Companies Act, conducting business under the laws of India with its Registered Office located in Ahmedabad, Gujarat, India. This case arises out of a dispute between Cadila/CPL and Fragchem, a corporation that is engaged in the import and export of chemicals. Fragchem is organized under the laws of Illinois with its principal place of business in Niles, Illinois.

On May 9, 1997, Cadila and Fragchem entered into an exclusive Supply Agreement. Under the terms of this agreement, Cadila was required to manufacture and supply certain chemicals exclusively to Fragchem, in exchange for which Fragchem was to transfer details of the processes and technical data to enable Cadila to develop and manufacture those chemicals. In particular, Fragchem provided technical specifications, the general process for manufacturing Chlorhexidine Base, Chlorhexidine HCL, and Chlorhexidine Gluconate 20% solution (the "C Products"), information regarding raw materials, and processing details. Cadila's end of the deal was that it agreed to manufacture and supply C Products exclusively for Fragchem using the information and technology it supplied. The Supply Agreement also stipulated that Fragchem was to purchase C Products exclusively from Cadila.

Several months after the agreement was signed, Cadila began shipping C Products to Fragchem. Fragchem initially made its payments directly to Cadila, but in 2000, Cadila informed Fragchem that it should start submitting purchase orders and payments for C Products to its subsidiary, CPL, which it indicated was also bound by the terms of the Supply Agreement. Fragchem ultimately agreed to submit its subsequent payments to CPL.

The Supply Agreement, which is at the heart of this case, contained an agreement to arbitrate that read:

> Any controversy arising under this Agreement, or any breach thereof, shall be referred to and finally settled pursuant to Arbitration in accordance with the provisions of Arbitration and Conciliation Proceedings prevalent in India, and judgment upon this award may be entered in any court having jurisdiction. However, such Arbitration proceedings shall take place in Ahmedabad (Gujarat) in India and the language of such arbitration shall be English.

In addition, with respect to amendment and assignment, the Supply Agreement provided as follows:

> The agreement may not be amended, waived, discharged, or terminated orally, but only by an instrument in writing signed by the party against which enforcement . . . is sought. This agreement shall be binding upon the respective parent, subsidiaries, affiliates, successors, and assigns of CPL and Fragchem. This agreement may not be assigned by any party without the written consent of the other parties.

The Supply Agreement itself had an initial term of five years, and could be terminated upon written notice given at least 180 days before expiration of the initial five-year term. In accordance with this provision, Cadila gave Fragchem written notice on November 7, 2001 that

it was terminating the supply agreement effective May 8, 2002. Fragchem acknowledged this termination by letter dated May 6, 2002:

> By your notice of termination dated November 7, 2001, you have expressed your will to terminate the above referred supply agreement at the end of the first contract period ending by May 8, 2002 . . . . Now that through your notice referred above, our above referred understanding "agreement" will come to an end . . . .

This same letter also admonished CPL that it ". . . shall not manufacture and/or sell Chlorhexidine Base and its salts after May 8, 2002 . . . ."

In an about-face one month later, on June 3, 2002, Fragchem's Secretary, Kirit Parikh, sent another letter to Cadila's chairman:

> I am confident that we will soon reach a new agreement to serve as the basis for moving forward for the benefit of all parties involved. Until that time, let's do business just as we had been doing prior to the termination of the Supply Agreement.

There is no evidence of a written response from CPL, though Parikh submitted an affidavit that indicates that it is his belief that Cadila and Fragchem agreed to continue doing business under the Supply Agreement.

Regardless, Fragchem and CPL continued to do business from June 2002 to March 2004. Fragchem contends that these deals were done pursuant to the Supply Agreement. CPL contends that these purchases were made on an individualized basis, sometimes pursuant to a written purchase order from Fragchem, and more often orally. CPL asserts that to the extent that these purchases were made pursuant to any identifiable agreement, it would have been their standard terms and conditions form, which states:

> All sales are subject to and expressly conditioned upon the terms and conditions contained herein. No variation of these terms and conditions will be binding upon seller unless agreed to in writing by an authorized representative of seller.

Notably, CPL's standard terms and conditions form does not contain an arbitration provision.

In April of 2004, Fragchem placed an order for 4,000 kilograms of CH Base from CPL.[1] Fragchem disputes that it had actually placed the April order, but admits that it received the product and never paid the $131,000 owed to CPL. The record reflects that Fragchem has withheld payment from CPL because it believes that Cadila owes it commissions for C Product sales made by Cadila to other customers.

In response, CPL filed a complaint against Fragchem on March 10, 2006, asserting claims for breach of contract arising out of Fragchem's failure to make payment after the April delivery. Fragchem countered by filing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(7) on the ground that Cadila was a necessary party to the action since the shipment was made pursuant to the Supply Agreement between Cadilla and Fragchem. CPL argued that the Supply Agreement had been terminated at the time of the April 2004 shipment at issue, and Cadila was therefore not a necessary party to the suit. At the initial presentment of the motion to dismiss, the trial judge inquired as to the propriety of venue in the Northern District of Illinois given the arbitration provision in the Supply Agreement. CPL responded that any disputes between Cadila and Fragchem

---

[1] The record is not clear on whether this order was made orally or through a written purchase order.

were subject to arbitration in India and that Cadila would not waive arbitration.

The district court issued its order on March 19, 2007. Instead of deciding the motion to dismiss for failure to join a necessary party, the court dismissed CPL's lawsuit *sua sponte* for improper venue based on Federal Rule of Civil Procedure 12(b)(3). In its analysis, the district court did not examine the issue of whether the Supply Agreement was still in effect at the time of the April 2004 shipment. It assumed that the arbitration provision contained in the Supply Agreement applied to the dispute in this case, and concluded that the proper venue is arbitration in India as opposed to litigation in the Northern District of Illinois. Because the district court also found that CPL is bound by the Supply Agreement as a subsidiary of Cadila, it denied Fragchem's motion to dismiss as moot and dismissed the case.

## II. Discussion

This Court's recent decision in *Automobile Mechanics Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740 (7th Cir. 2007), is controlling. In that case, we reversed an order, issued *sua sponte* by the district court, dismissing a lawsuit for lack of venue pursuant to Federal Rule of Civil Procedure 12(b)(3) on the basis of a contractual arbitration clause. We reasoned there, as we do here, that a *sua sponte* order of dismissal of this nature is improper because an objection to venue can be waived or forfeited. *American Patriot Ins. v. Mutual Risk Management, Ltd.*, 364 F.3d 884, 887 (7th Cir. 2004). To be sure, "[d]ismissal on the court's own initiative is particularly ill-conceived as an effort to enforce a contractual arbitration clause" because, like many other contractual rights, it may be waived. *Automobile Mechanics*, 502 F.3d at 747. The district court here "offered no

reason why it had either the right or the duty to reject such a waiver," given that neither party had moved to enforce the arbitration agreement and dismiss on the grounds of improper venue. *Id.*

Fragchem tries to distinguish this case from *Automobile Mechanics* in two ways, and each one is unavailing. First, it argues that the Court in *Automobile Mechanics* did not believe there was an arbitration agreement between the two parties in the case. While there was a lack of factual clarity on this point, this Court nevertheless stated that its conclusion would hold "[e]ven if the agreement to arbitrate between the employer and the union somehow carried over to the Funds . . . ." *Id.* Second, Fragchem contends that it is significant that in *Automobile Mechanics*, both parties agreed that dismissal by the lower court was improper. This is a red herring. It is of no moment that Fragchem actually now agrees with what the district court did here—what matters is that neither party filed a motion to dismiss based on improper venue nor did they file a motion to compel arbitration, thereby leaving open the possibility of waiver.[2]

Because the district court dismissed the case *sua sponte* for improper venue based on the arbitration clause contained in the Supply Agreement, it did not address the key issue here of whether the parties are still bound by the agreement. On appeal, both parties agree that the Supply Agreement terminated two years before the sale at issue in this lawsuit. However, Fragchem argues that

---

[2] CPL did claim at the initial presentment before the district court that it believed that Cadila would not waive arbitration. However, because Cadila is not yet a party to the suit here, this statement by itself is not enough to counter the view that both parties here could still have waived their agreement to arbitrate prior to the district court's ruling.

Kirit Parikh's letter dated June 3, 2002, coupled with Cadila/CPL's continued manufacture and sale of C Products, indicates that the Supply Agreement was still in full force. CPL, however, relies on this Court's twin decisions in *Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc.*, 307, F.3d 601 (7th Cir. 2002), and *Nissan North America, Inc. v. Jim M'Lady Oldsmobile, Inc.*, 486 F.3d 989 (7th Cir. 2007), for the proposition that an agreement to arbitrate does not survive if the written agreement between two parties expired, and there was no subsequent written agreement governing the parties' relationship that contained an arbitration clause. While there are questions of law here, there are also questions of fact, and so the issue of whether the Supply Agreement covered the April 2004 transaction is better left to the district court as a matter of first impression. *See International Financial Services Corp. v. Chromas Technologies Canada, Inc.*, 356 F.3d 731, 740 ("Whether veil-piercing is appropriate depends on a host of considerations that this court is ill-positioned to weigh as a matter of first impression."); *Turner v. J.V.D.B. Assocs., Inc.*, 330 F.3d 991, 998 (7th Cir. 2003) (refusing to direct the entry of summary judgment in favor of one party when the district court had not yet made a ruling on the issue, in part because of the state of the record). What we have ruled here is that it was improper for the district court to dismiss the lawsuit *sua sponte* on the grounds of improper venue based on an arbitration agreement between the parties when neither party explicitly or effectively indicated that it would not waive arbitration. Nevertheless, even if on remand one of the parties moves to compel arbitration, the district court will still have to grapple with the question of whether the Supply Agreement applies to the transaction at issue.

### III.  Conclusion

For the foregoing reasons, we REVERSE the district court's *sua sponte* order dismissing the lawsuit.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*