In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1546

LINE CONSTRUCTION BENEFIT FUND,

*Plaintiff-Appellee,*

*v.*

ALLIED ELECTRICAL CONTRACTORS, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 0950—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED SEPTEMBER 21, 2009—DECIDED JANUARY 8, 2010

Before CUDAHY, WOOD, and TINDER, *Circuit Judges.*

WOOD, *Circuit Judge.* Line Construction Benefit Fund ("Lineco") is a multiemployer employee welfare fund that receives contributions from employers pursuant to collective bargaining agreements ("CBAs") negotiated between employers and unions. The Southeastern Line Constructors Chapter of the National Electrical Contractors Association ("NECA") and the International Brotherhood

of Electrical Workers, Local Union 474 ("the Union") operate under such agreements, which require participating employers to pay into the fund for all covered employees. Sometimes, when so many different entities are involved in an arrangement, all of the "T's" are not crossed as clearly as they might be. Essentially, that kind of problem is what gave rise to this lawsuit.

The question before us is the extent to which Allied Electrical Contractors, Inc. ("Allied"), a Tennessee electrical contractor and a member of NECA since 2002, is obliged to contribute to Lineco. Allied was not an original signatory to the 2005 CBA between NECA and the Union; it did not execute a formal letter of consent until December 7, 2006. Allied argues that this means that it was not bound by the CBA until that date. But Allied's argument treats as irrelevant the fact that its course of conduct—making payments precisely in accordance with the 2005 CBA from the start—demonstrates its assent to that agreement. We conclude, as the district court did, that Allied is liable for the deficiencies at issue here.

I

Lineco is a multiemployer welfare fund administered in accordance with section 302(c)(5) of the Labor Management Relations Act ("LMRA") and the Employee Retirement Income Security Act of 1974 ("ERISA"). Allied began making payments to Lineco for Union employee benefits in 1993. In 2005, the Southeastern Line Constructors Chapter of NECA and the Union

entered into a CBA, which among other things set forth the terms under which Lineco would receive contributions pursuant to a trust agreement that established the fund. The 2005 CBA changed the hourly contribution rate from $4.50 per hour (set by an earlier CBA) to $4.75 per hour for the work of covered employees. The 2005 CBA included a clause making it applicable to "all firms who sign a letter of consent to be bound by the terms of this agreement." The CBA took effect on December 1, 2005.

In keeping with the 2005 CBA, Allied began making contributions at $4.75 per hour in December 2005. It continued to do so until July 2006, when it missed a payment. Allied did not make a contribution for August either. In October of 2006, the Union barred Allied President Michael Eskridge from a NECA-Union negotiating session, because Allied had not signed a letter of consent under the CBA. On December 7, 2006, Allied executed a form letter of consent. Yet Allied failed to make the contributions that it acknowledged were due for December 2006, January 2007, and February 2007. In March 2007, Allied resumed payments as required by the CBA.

When the missing funds were not forthcoming, Lineco brought suit in the United States District Court for the Northern District of Illinois. Citing the CBA and the Trust Agreement, Lineco alleged that Allied owes it a total of $138,605.25, representing the delinquent contributions for July, August, and December 2006, and January and February 2007. Allied moved to dismiss Lineco's

action for lack of standing or, in the alternative, for partial summary judgment; Lineco responded with a cross-motion for summary judgment. On November 26, 2008, the district court dismissed Allied's motion and granted Lineco's cross-motion for summary judgment. Later, on January 29, 2009, it entered judgment requiring Allied to pay Lineco $200,816.36, the amount of the delinquent payments plus interest, statutory liquidated damages, attorneys' fees, and costs. Allied appeals, arguing that Lineco is not authorized to sue under section 502(e) of ERISA, 29 U.S.C. § 1132(e), and that Allied was not bound by the CBA until it executed the letter of consent.

## II

Allied has asserted throughout this action that Lineco lacks standing to bring suit under 29 U.S.C. § 1132(e). What Allied means, however, is that Lineco lacks a right of action. In order to evaluate this argument, we must look to the statute. The obligation of employers to make contributions in accordance with the terms of a collectively-bargained agreement is found in section 1145. The parties authorized to bring suit under the statute are described in section 1132(a), (e); proper plaintiffs include participants, beneficiaries, or fiduciaries of a plan. This court has held that multiemployer plans are fiduciaries for the purposes of section 1132(e). *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 744-45 (7th Cir. 2007). We reaffirm that holding today.

Section 1132(d)(1) establishes the legal status of multiemployer plans for purposes of ERISA: "An

employee benefit plan may sue or be sued under this title as an entity." Section 1132(e), however, does not mention plans as such in the list of authorized plaintiffs. Instead, as we just noted, it grants a right of action to "fiduciaries of a plan." We must therefore determine who is a fiduciary of a plan and whether a plan itself may sue either as a fiduciary or on behalf of the fiduciaries. The first question is easy, because the statute addresses it. A person is a fiduciary "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

Allied focuses on the second part of the inquiry and asserts that a plan cannot be a fiduciary of itself. In our view, however, this is too simplistic a view of a plan. Any and all actions taken by a plan are done by the administrators who act on its behalf—in other words, by the fiduciaries who exercise discretionary authority or control with respect to the management of a plan. Accord *Saramar Aluminum Co. v. Pension Plan,* 782 F.2d 577, 580-81 (6th Cir. 1986). But see *Local 159 v. Nor-Cal Plumbing, Inc.,* 185 F.3d 978, 981-84 (9th Cir. 1999) (holding that the court lacked subject-matter jurisdiction for a suit by an ERISA plan under section 1132(a)(3)); *Pressroom*

*Unions-Printers League Income Sec. Fund v. Cont'l Assurance Co.,* 700 F.2d 889, 891-93 (2d Cir. 1983), *cert. denied,* 464 U.S. 845 (1983) (holding that the federal court lacked subject-matter jurisdiction under section 1132(e) for a suit brought by an ERISA plan). (The characterization of the issue in these cases as a problem of subject-matter jurisdiction is especially questionable in light of the Supreme Court's decision in *Union Pac. R. Co. v. Bhd. of Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment,* 130 S.Ct. 584, 596-97 (2009), which underscores the difference between issues relating to subject-matter jurisdiction and those relating to other claims-processing rules.)

Allied acknowledges that plans may sue under other provisions of ERISA and the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), such as 29 U.S.C. § 1381 (withdrawal liability) and 29 U.S.C. § 1109 (breach of fiduciary duty). See, *e.g., Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co.,* 698 F.2d 320, 326 (7th Cir. 1983) (finding that a plan may bring suit for breach of a fiduciary duty pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), (d)(1)). Allied notes that section 1109, for example, confers specific rights on plans (for example, the right to require another "to make good to such plan" for breach of a fiduciary duty) that are absent from section 1145, which imposes the substantive obligation that Lineco seeks to enforce. But this argument misapprehends the source of the right to sue under these provisions. It is section 1132, rather than sections 1109 and 1145, that grants to fiduciaries the right to sue to enforce substantive rights. If a plan is a

fiduciary for the purposes of section 1132(a)(2) (enforcing section 1109), then a plan is a fiduciary for the purposes of section 1132(a)(3) (enforcing section 1145).

CBAs designate plans to collect ERISA contributions; Congress has provided that plans can sue and be sued, and that fiduciaries may enforce substantive rights, including those at issue in this case. We see no reason to deviate from our decision in *Vanguard Car Rental, supra,* and thus we confirm that a multiemployer plan may sue as a fiduciary under 29 U.S.C. § 1132(e).

## III

We review decisions on cross motions for summary judgment *de novo*. *Rickher v. Home Depot, Inc.,* 535 F.3d 661, 664 (7th Cir. 2008). This case does not implicate any of the issues concerning standard of review that have been raised in recent cases involving denials of benefits. See *Metro. Life Ins. Co. v. Glenn,* 128 S.Ct. 2343 (2008); *Fischer v. Liberty Life Assur. Co. of Boston,* 576 F.3d 369 (7th Cir. 2009); *Krolnik v. Prudential Ins. Co. of America,* 570 F.3d 841 (7th Cir. 2009). Our job instead is to interpret and apply the governing agreements, which we approach *de novo.*

Allied concedes that it was required to make contributions for work done after it signed the letter of consent on December 7, 2006. Our holding that Lineco is entitled to bring suit to recover delinquent contributions under the CBA is enough to establish that Allied must pay Lineco for obligations incurred after that date—that is, for most of December 2006 and all of January and

February 2007. Whether Allied also owes Lineco for delinquent payments from July, August, and early December 2006 requires additional analysis.

We begin with the question whether Allied was bound by the CBA before December 7, 2006. "[A] signature to a collective bargaining agreement is not a prerequisite to finding an employer bound to that agreement." *Bricklayers Local 21 of Ill. Apprenticeship & Training Program v. Banner Restoration*, 385 F.3d 761, 767 (7th Cir. 2004). Assent can also be established through other evidence, including most importantly conduct manifesting agreement, such as "the payment of union wages, the remission of union dues, the payment of fringe benefit contributions, the existence of other agreements evidencing assent and the submission of the employer to union jurisdiction, such as that created by grievance procedures." *Id.* at 766 (citing cases). (We note in passing that dues checkoffs are permissible under the National Labor Relations Act only if the employer is bound by a collective bargaining agreement. See 29 U.S.C. § 186(c)(4); *U.S. Can Co. v. NLRB*, 984 F.2d 864, 869 (7th Cir. 1993). If Allied was collecting union dues during this time period, that is strong evidence that it was party to the CBA. Without a CBA, such collections are illegal.)

According to a contribution table provided by Lineco, Allied had made contributions to the fund since 1993. The table also reveals that Allied's payment rate jumped from $4.50 per hour to $4.75 per hour—as required by the 2005 CBA—at the time when the new CBA took effect. Allied continued to make contributions according to the

CBA except for the months at issue in this case. Allied's President, Michael Eskridge, admitted at his deposition that the company issued contribution reports to Lineco the "majority of months." This undisputed course of events manifests assent to the 2005 CBA.

In October 2006, the Union barred Eskridge from a NECA-Union negotiation because Allied had not signed a letter of consent. Allied believes that this incident shows that the Union did not believe that Allied was bound to the CBA: as Allied sees things, it was barred from one benefit of the arrangement (a seat at the table), and thus it should not incur any burdens. But this incident was peripheral, at best, to the contribution dispute. In fact, it suggests that Allied recognized its interest in the CBA, and maybe even assumed that it was a party through its NECA membership. When Allied learned that it had not complied with a procedural requirement, it remedied that omission with a form letter shortly thereafter. Moreover, our holding in *Central States Pension Fund v. Gerber Truck Service, Inc.*, 870 F.2d 1148 (7th Cir. 1989) (*en banc*), demonstrates that even if the Union had sent Allied a letter stating that it was not covered by the CBA until it affixed an authorized signature, such a letter would not be conclusive on an ERISA plan.

Allied also argues that the CBA's explicit requirement of a letter of consent should preclude the court from holding it bound by the agreement until it issued such a letter. See *Merrimen v. Paul F. Rost Electric, Inc.,* 861 F.2d 135 (6th Cir. 1988) (finding no obligation where the em-

ployer did not sign a letter of assent as required by the CBA). We have not taken such a formalistic position. Instead, we have held repeatedly that conduct manifesting assent creates an obligation; a contrary rule would ignore commercial realities and would create a loophole for parties seeking to escape responsibilities that they have acknowledged through their behavior.

The LMRA does not excuse Allied's delinquencies either. The LMRA provides that employers may not make payments to employee benefit funds unless those contributions are specified in a written agreement. 29 U.S.C. § 186(c)(5)(B). This court has read this requirement literally. As long as the agreement is written, it does not have to be "a signed, unexpired collective bargaining agreement between the parties," see *Gariup v. Birchler Ceiling & Interior Co.*, 777 F.2d 370, 375 (7th Cir. 1985), or even a signed agreement at all. See *Bricklayers*, 385 F.3d at 770 ("[T]he existence of a 'written agreement,' albeit an unsigned one, detailing the terms upon which the fringe benefit contributions were to be made, and [employer's] payment of contributions in accordance with that agreement, effectively concludes our inquiry."). Here, the CBA serves as the written agreement, and it is enough for the LMRA. (This actually may be good news for Allied; otherwise all of its other contributions under the 2005 CBA would have been improper.) Therefore, Allied cannot use the LMRA to escape its obligations incurred prior to December 7, 2006.

Lineco properly brought suit under ERISA and is entitled to the delinquent contributions for July, August,

and December 2006, and January and February 2007. The decision of the district court is AFFIRMED.