ATTORNEYS FOR APPELLANTS
Robert D. MacGill
Charles P. Edwards
Christian P. Jones
Mark D. Crandley
Barnes & Thornburg LLP
Indianapolis, Indiana

Dan J. Hofmeister, Jr.
Kevin D. Tessier
Reed Smith LLP
Chicago, Illinois

ATTORNEYS FOR AMICI CURIAE
[see addendum]

ATTORNEYS FOR APPELLEE
CONTINENTAL CASUALTY
COMPANY
Stephen J. Peters
David I. Rubin
Plunkett Cooney, P.C.
Indianapolis, Indiana

Michael M. Marick
Rebecca R. Haller
Meckler Bulger Tilson Marick &
Pearson LLP
Chicago, Illinois

ATTORNEYS FOR APPELLEE
TWIN CITY FIRE INSURANCE
COMPANY
James W. Riley, Jr.
Riley Bennett & Egloff, LLP
Indianapolis, Indiana

John E. Black, Jr.
Peter F. Lovato
Skarzynski Black LLC
Chicago, Illinois

Mark E. Haddad
Jonathan F. Cohn
Eric D. MacArthur
Sidley Austin LLP
Washington, DC

# In the
# Indiana Supreme Court

No. 49S05-1404-PL-244

**FILED**
Apr 22 2015, 2:31 pm
CLERK
of the supreme court,
court of appeals and
tax court

WELLPOINT, INC. (F/K/A ANTHEM, INC.) AND
ANTHEM INSURANCE COMPANIES, INC.,                               *Appellants (Plaintiffs)*,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,
AIG EUROPE (U.K.) LIMITED,
NEW HAMPSHIRE INSURANCE COMPANY,
CONTINENTAL CASUALTY COMPANY,
ARROWOOD INDEMNITY COMPANY,
TWIN CITY FIRE INSURANCE COMPANY,
LIBERTY MUTUAL INSURANCE COMPANY (U.K.) LIMITED, AND
CERTAIN UNDERWRITERS AT LLOYDS,                                 *Appellees (Defendants)*.

Appeal from the Marion Superior Court, No. 49D10-507-PL-26425
The Honorable David J. Dreyer, Judge

On Transfer from the Indiana Court of Appeals, No. 49A05-1202-PL-92

**April 22, 2015**

**Dickson, Justice**.

Anthem, Inc. is a large managed health care organization. At all times relevant to this litigation, it was self-insured for errors and omissions (E&O) liability and had purchased policies from other insurers to reinsure its E&O liabilities. After Anthem settled certain multi-district litigation without admitting liability, it sought indemnification from its reinsurers, some of which denied coverage and successfully sought summary judgment. We reverse the trial court and in large part grant summary judgment for Anthem.

The litigation culminating in this instant appeal has been ongoing for over a decade. Anthem[1] had set up a complex and multi-tiered insurance arrangement to reinsure itself for E&O liability. Under this arrangement, Anthem was its own primary and excess insurer for E&O liability, with a certificate of reinsurance on its primary policy issued by National Union Fire Insurance Company (National Union) and numerous certificates of reinsurance on its excess policies issued by a bevy of additional reinsurers (together, Excess Reinsurers). Both Anthem's excess policies and the reinsurance policies "follow form," i.e. incorporate all the terms and conditions of the primary policy Anthem issued itself.[2]

Beginning in 1998, Anthem and other managed care organizations and medical service payors (collectively, MCOs) were confronted by various lawsuits alleging that the MCOs had engaged in a pattern of failing to pay claims in a full and timely manner, thereby breaching certain agreements and selected state and federal statutes. *See* Appellants' App'x at 2035. The present litigation arises out of several specific cases. Two were originally filed in Connecticut state court

---

[1] In 2004, Anthem, Inc., merged with one of its co-defendants in the underlying litigation, WellPoint Health Networks Inc., to form WellPoint, Inc. For ease of reference, after this factual summary and for our analysis, we will collectively refer to the plaintiffs in this reinsurance coverage litigation, namely the merged entity WellPoint, Inc. and Anthem Insurance Companies, Inc., simply as "Anthem."

[2] Because the certificates of reinsurance on Anthem's excess policies are essentially identical to the coverage language in the primary insurance Anthem issued to cover its own E&O liability, for simplicity, we will refer to such reinsurance certificates collectively as "the Policy" for our analysis.

(<u>Levinson</u> and <u>CSMS</u>),[3] wherein a group of doctors and the Connecticut State Medical Society (CSMS) set forth claims for breach of contract, breach of the duty of good faith and fair dealing, violation of the Connecticut Unfair Trade Practices Act (CUTPA) and Unfair Insurance Practices Act, negligent misrepresentation, and unjust enrichment. *See id.* at 3945–57, 3993–96. In actions originally filed in Florida (<u>Shane I</u>, <u>Shane II,</u> and <u>Thomas</u>),[4] the plaintiffs asserted claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), including conspiracy and aiding and abetting, and claims for breach of contract and violations of prompt-pay statutes—among others. *See* Appellants' App'x at 3647–63, 3901–05. All actions alleged substantially the same wrongful conduct, namely that, after promising to pay doctors in a timely manner for rendering covered, medically-necessary services in accordance with standard medical coding procedures, Anthem engaged in an improper, unfair, and deceptive scheme designed to systematically deny, delay, and diminish payments due.[5]

These actions were consolidated into a federal multi-district litigation proceeding in the Southern District of Florida known as <u>In re Managed Care Litigation</u>, No. 1:00-MD-1334-MORENO (the Underlying Litigation). By March 2005, those claims alleging breach of contract, unjust enrichment, and violations of state prompt pay statutes were dismissed or dropped. *See* Joint Pretrial Stipulation, <u>In re Managed Care Litig.</u> at 9 n.4, Appellants' App'x at 999. Anthem settled the Underlying Litigation in July 2005 without admitting and instead denying any wrongdoing or liability.[6] The settlement provided for both cash payments and implementation of specific

---

[3] <u>Levinson v. Anthem Health Plans, Inc.</u>, No. CV-01-0448288-S (Conn. Super. Ct. 2001), No. 3:01cv426 (D. Conn. 2001); <u>Conn. State Med. Soc'y v. Anthem Health Plans, Inc.</u>, No. CV-01-0448287-S (Conn. Super. Ct. 2001), No. 3:01cv428 (D. Conn. 2001). *See* Tag-Along Status Reports in Appellants' App'x at 1807, 1812.

[4] <u>Shane v. Humana, Inc.</u>, No. 00-1334-MD-MORENO ("<u>Shane I</u>"); <u>Shane v. Humana, Inc.</u>, Case No. 04-21589-CIV-MORENO ("<u>Shane II</u>") [hereinafter collectively "Shane"]; <u>Thomas v. Blue Cross and Blue Shield Ass'n</u>, No. 03-21296-CIV-MORENO. *See* Appellants' App'x at 3675.

[5] The alleged improper business practices included improper bundling and downcoding of claims, failure to recognize modifiers reflecting the complexity of a procedure, improper use of automated claims processing software, denial of claims to achieve internal financial targets without regard to medical necessity, incentivizing administrative staff to meet cost targets and penalizing doctors for high utilization, and failure to provide adequate staffing to handle physician inquiries.

[6] In their joint motion for final approval of their settlement, the parties wrote that "The parties still fundamentally disagree about the merits of Plaintiffs' case and WellPoint continues to deny all material allegations of wrongdoing and liability. Yet, WellPoint has agreed to the Settlement in order to put to rest

3

business practice initiatives consistent with requested injunctive relief. Appellants' App'x at 4019, 4067–68, 4075–76. Nearly a year after Anthem's settlement, the district court granted summary judgment in <u>Shane</u> and <u>Thomas</u> in favor of the remaining, non-settling defendants[7] on all remaining claims, including the RICO conspiracy claims. *See* <u>In re Managed Care Litig.</u>, 430 F.Supp.2d 1336, 1357 (S.D. Fla. 2006), *aff'd sub nom.* <u>Shane v. Humana, Inc.</u>, 228 Fed. Appx. 927 (11th Cir. 2007). The primary reinsurer for Anthem's self-insurance E&O policy, National Union, paid and ultimately exhausted its coverage. The Excess Reinsurers then denied coverage for Anthem's defense and settlement of the Underlying Litigation, whereupon Anthem filed the instant suit. Anthem claims professional liability coverage under Part II of the Policy, which provides in part that the Policy will pay the "Loss of the Insured resulting from any Claim or Claims first made against the Insured . . . for any Wrongful Act of the Insured . . . but only if such Wrongful Act . . . occurs solely in the rendering of or failure to render Professional Services." Appellants' App'x at 852, 3447

Continental Casualty Company (CNA) filed a motion for summary judgment, arguing in part that there was no coverage under the relevant policy language because the claims settled in the Underlying Litigation had not arisen out of acts that had occurred "solely" in Anthem's rendering of, or failure to render, professional services.[8] The trial court agreed with that argument and several others made by CNA and, determining that there was no just reason for delay, granted summary judgment and directed entry of final judgment for CNA. Anthem initiated this appeal. A few months later, the trial court granted Twin City's request to be joined in the final judgment order in favor of CNA on the same grounds. *See* Appellants' App'x at 6450–52; 6515. Anthem brought a separate, additional appeal from this judgment favoring Twin City.[9] Consolidating Anthem's appeals, the Court of Appeals affirmed on the one basis that the allegations against Anthem

---

the risks, uncertainties, and costs inherent in such litigation." Joint Motion for Final Approval of Settlement, Appellants' App'x at 2041.

[7] Only United Healthcare, Inc., United Health Group Inc., (collectively, "United") and Coventry Health Care, Inc. remained as Defendants. *See* <u>In re Managed Care Litig.</u>, 430 F.Supp.2d 1336, 1340 n.1 (S.D. Fla. 2006), *aff'd sub nom.* <u>Shane v. Humana, Inc.</u>, 228 Fed. Appx. 927 (11th Cir. 2007).

[8] Earlier in this proceeding, Twin City obtained summary judgment against Anthem on other grounds, but was reversed on appeal. <u>WellPoint, Inc. v. Nat'l Union Fire Ins. Co.</u>, 952 N.E.2d 254, 263 (Ind. Ct. App. 2011) ("WellPoint I"), *trans. denied.*

[9] Consequently, there are two appellant briefs from WellPoint in this case, one filed on May 29, 2012 and another filed August 17, 2012.

4

"did not arise 'solely,' *i.e.*, exclusively or entirely, out of its claims handling activities . . . ." Well-Point, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, No. 49A05-1202-PL-92, 989 N.E.2d 845, 2013 WL 3149002, at *7 (Ind. Ct. App. June 19, 2013) ("WellPoint II") (table).

Anthem requests that this Court reverse the trial court's order granting summary judgment in favor of CNA and Twin City and instead enter summary judgment in its favor. *See* Appellants' 5/29/12 Br. at 58; Appellants' 8/17/12 Br. at 8. While granting transfer thereby automatically vacating the decision of the Court of Appeals, we nevertheless summarily affirm the consolidation of the two appeals. Ind. Appellate Rule 58(A)(2).

Summary judgment is appropriate where the designated evidence shows that there is no genuine issue as to any fact material to a particular issue or claim and that the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C). When summary judgment has been sought by any party, "the court may grant summary judgment for any other party upon the issues raised by the motion although no motion for summary judgment is filed by such party." T.R. 56(B). An appellate court reviews entries of summary judgment *de novo*—through the same lens as the trial court, construing all designated evidence and reasonable inferences and re-solving any doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.[10] Holiday Hospitality Franchising, Inc. v. AMCO Ins. Co., 983 N.E.2d 574, 577 (Ind. 2013). The interpretation of an insurance policy "is particularly well-suited for de novo ap-pellate review, because it generally presents questions purely of law." *Id.* We interpret insur-ance contracts under the same rules of construction as any other contract. *Id.* Clear and unam-biguous language is given its ordinary meaning. Where contractual language is ambiguous, our primary goal is "to determine the intent of the parties at the time the contract was made." *Id.* (quoting First Fed. Sav. Bank of Ind. v. Key Mkts., Inc., 559 N.E.2d 600, 603 (Ind. 1990)).

---

[10] The trial court solicited proposed orders concerning CNA's motion for summary judgment, and both Anthem and CNA submitted proposed orders with findings of fact and conclusions of law. *See* Tr. at 6; Appellants' App'x at 6264, 6389. In its eighty-one-page final order, the trial court adopted nearly verbatim the 88-page proposed order from CNA granting summary judgment in its favor. *Id. Compare* Final Summary Judgment Order, Appellants' App'x at 1–81, *with* Proposed Final Summary Judgment Or-der, Appellants' App'x at 6267–6353. We find *de novo* review especially pertinent in this case.

5

As plaintiff in the present litigation, Anthem seeks coverage under Part II of its policies with the Excess Reinsurers for its losses in the Underlying Litigation including its ultimate settlement for $198 million,[11] its defense costs, and other losses it incurred in the settlement agreement. In relevant part, the Policy provides:

COVERAGE II.          INSURANCE COMPANY PROFESSIONAL LIABILITY

**1. INSURING AGREEMENT**

PROFESSIONAL LIABILITY

This policy shall pay the Loss of the Insured resulting from any Claim or Claims . . . for any Wrongful Act of the Insured . . . but only if such Wrongful Act . . . occurs solely in the rendering of or failure to render Professional Services.

. . .

**4. DEFINITIONS**

(a) **"Loss"** means damages, judgments, settlements and Defense Costs. Loss shall include awards of punitive or exemplary damages and the multiplied portion of multiplied damages (where insurable by law). Loss shall not include:

    . . .

    (ii)    the cost of complying with any settlement for or award of non-monetary relief;

        . . .

    (iv)    civil or criminal fines or penalties imposed by law . . . or matters that may be deemed uninsurable under the law pursuant to which this policy shall be construed.

(b) **"Professional Services"** means services rendered or required to be rendered solely in the conduct of the Insured's claims handling and adjusting, safety engineering, safety inspection, loss control, personal injury rehabilitation operations, salvage operations, recovery subrogation services, and premium financing.

(c) **"Wrongful Act"** means any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted.

Appellants' App'x at 852, 3447. Coverage II follows these definitions with a list of some 28 coverage exclusions:

---

[11] As part of the settlement, Anthem and WellPoint Health Networks Inc. made a cash payment of $198 million and agreed to change certain business practices in exchange for a full release. Although the settlement agreement itself does not allocate the respective obligations of Anthem and WellPoint Health Networks, Anthem in fact paid about $92.81 million, reflecting a percentage of the settlement consistent with the relative membership of the Anthem and WellPoint entities. *See* Appellants' App'x at 1961–62, 2026, 2100, 2110, 3329, 4746; *see also* Appellants' 5/29/12 Br. at 6 & n.1.

**5. EXCLUSIONS**

This coverage section does not apply:

(a)  to any criminal act;
(b)  to any dishonest or fraudulent act or omission, provided, that this exclusion shall not apply to any Claim seeking both compensatory and punitive damages based upon or arising out of allegations of both fraud and bad faith in the rendering of or failure to render Professional Services;
(c)  to any Claim made . . .
(d)  to any Claim made . . .
(o)  to any Wrongful Act committed with knowledge that it was a Wrongful Act; . . . .

*Id.* at 852–53, 3447–48.

This consolidated appeal stems from the final summary judgment order in favor of CNA, later joined by Twin City. In reviewing this entry of summary judgment, standing in the shoes of the trial court, we focus on the issues presented and evidence designated by CNA to the trial court—adopted wholeheartedly without modification by Twin City in its request for joinder. *See* Appellants' App'x at 610–86; 6452. In its motion for summary judgment, CNA argued that it "is entitled to summary judgment because the undisputed facts and well-established law demonstrate, as a matter of law, there is no coverage under the [Policy] Anthem issued to itself . . . based on public policy, as well as the express terms of the [Policy]." *Id.* at 611. CNA raised three principle claims why Anthem's settlement of the Underlying Litigation was not covered under the Policy and thus CNA did not breach its contract with Anthem, which we restate and reorder as (a) whether the conduct at issue was committed "solely" in the performance of "Professional Services" as required by the Policy; (b) whether the relief sought constitutes a "Loss" under the Policy or otherwise is barred by Indiana public policy; and (c) whether Anthem's alleged wrongful acts are barred by the Policy's exclusion for any "dishonest or fraudulent act or omission" or Indiana public policy. *Id.* at 617–18. In addition to its opposition to Anthem's claim for declaratory relief, CNA also responded to claims raised by Anthem relating to bad faith and punitive damages and defense costs.[12]

---

[12] Anthem sought relief on the following counts: Count I (Declaratory Judgment - ADR Dispute), Count II ("Declaratory Judgment - Coverage Dispute"), Count III ("Breach of Contract"), Count IV ("Bad

## 1. Application of "Professional Services" definition

CNA argues that there is no coverage for Anthem's settlement of the Underlying Litigation because "Anthem's Conduct At Issue Was Not Committed In The Performance Of 'Professional Services,' Much Less 'Solely' In The Performance Of 'Professional Services' As Required By The Policies." Appellants' App'x at 664. We disagree.

To qualify for coverage, Anthem's entire liability need not arise solely out of its claims handling activities. Coverage II provides professional liability coverage, stating: the Excess Reinsurers "shall pay the Loss of the Insured resulting from any Claim or Claims . . . against the Insured . . . for any Wrongful Act of the Insured . . . but only if such Wrongful Act . . . occurs solely in the rendering of or failure to render Professional Services." Appellants' App'x at 852, 3447. "Professional Services" are "services rendered or required to be rendered solely in the conduct of the Insured's claims handling or adjusting . . . ." *Id.* The clear and unambiguous language of the Policy therefore extends coverage to "*any* Claim or Claims" resulting from "*any* Wrongful Act" by Anthem that occurred "solely in the rendering of or failure to render" "claims handling and adjusting" services. *Id.* (emphasis added). The Policy covers not only Anthem's actions in adjusting and paying reimbursement claims from health care providers—but also its failure to do so.

The use of the word "solely" in the professional liability insuring agreement operates here to prescribe coverage for Anthem losses resulting from claims for any wrongful acts by Anthem in the course of its claims handling and adjusting services but not for losses resulting from claims for wrongful acts that occur outside its rendering of such services. The wrongful acts alleged by the original plaintiffs—engaging in an improper, unfair, and deceptive scheme designed to systematically deny, delay, and diminish claim payments—are clearly alleged wrongful acts by Anthem in the course of its claims handling and adjusting services and thus qualify as covered Wrongful Acts occurring in the

---

Faith"), and Count V ("Punitive Damages"). *See* Appellants' App'x at 3331–38. CNA sought summary judgment on Counts II, III, IV, and V only. *See* Appellants' App'x at 676.

rendering or failure to render Professional Services as specified in the insuring agreement. Further supporting this conclusion is the fact that "Wrongful Act" is broadly defined by the Policy to include "any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done or wrongfully attempted." Appellants' App'x at 852, 3447. The insuring agreement is thus intended to provide professional liability coverage for losses resulting from claims alleging a broad range of wrongful conduct. To the extent the parties to the insurance contract agree that coverage is not available for fraudulent, dishonest, or criminal acts, they may craft the conditions of such limitation in the policy exclusions, as discussed below. We conclude as a matter of law that the relief sought by Anthem falls within the coverage for professional liability in Coverage II of the Policy. Consequently, Anthem is also entitled to coverage for defense costs. *See* Appellants' App'x at 831 ("With respect to any such Wrongful Act *for which insurance is afforded by this policy*, the Insurer shall, as part of and subject to the limit of liability, pay on behalf of the Insured Defense Costs.") (emphasis added); *see also* Appellants' App'x at 852, 3447.

### 2. Application of "Loss" definition

CNA claims that "[e]stablished Indiana public policy—precluding coverage for an insured's intentional wrongdoing or its ordinary business obligations—precludes Anthem's claims against [CNA]" and that "Anthem expressly incorporated these public policy prohibitions into the Policies it issued to itself through the definition of 'loss,' the 'dishonest or fraudulent act' exclusion, and the 'uninsurable damages' exclusion." Appellants' App'x at 646, 647. Coverage II states that "Loss shall not include . . . the cost of complying with any settlement for or award of non-monetary relief . . . or matters that may be deemed uninsurable under the law pursuant to which the policy shall be construed." Coverage II ¶4(a), Appellants' App'x at 852, 3447. Anthem does not contest that the cost of implementing business practice initiatives, i.e. the "award of nonmonetary relief," fails to

9

qualify as a "Loss" under the Policy, but argues it should be indemnified for its other settlement costs.[13] CNA disagrees, contending that such costs are uninsurable under Indiana law[14] because, Anthem allegedly intentionally engaged in improper business practices, or in the alternative, because the relief Anthem seeks[15] is contractual or restitutionary in character. *Id.*

Under Indiana law, there is a "very strong presumption of enforceability" of contracts that represent the freely bargained agreement of the parties. Fresh Cut, Inc. v. Fazli, 650 N.E.2d 1126, 1129–30 (Ind. 1995), *cited by* In re Paternity of N.L.P., 926 N.E.2d 20, 23 (Ind. 2010). A court may refuse to enforce a contract, however, that (1) contravenes a statute, (2) clearly tends to injure the public in some way, or (3) is otherwise contrary to the declared public policy of this State. Fresh Cut, 650 N.E.2d at 1130. CNA's arguments fall under this third category. In determining whether to enforce a contract allegedly contravening the declared public policy of Indiana, we consider "(i) the nature of the subject matter of the contract, (ii) the strength of the public policy underlying the statute; (iii) the likelihood that refusal to enforce the bargain or term will further that policy; (iv) how serious or deserved would be the forfeiture suffered by the party attempting to enforce the bargain; and (v) the parties' relative bargaining power and freedom to contract." *Id.* at 1130 (internal citations omitted). "What the public policy of a state is must be determined from a consideration of its [c]onstitution, its statutes, the practice of its officers in the course of administration, and

---

[13] The Settlement specified the implementation of certain business practice initiatives (at an estimated cost of $250 million) and a $198 million settlement made up of a $5 million contribution to a charitable foundation, a $135 million payment to physicians, and up to $58 million in attorney fees. Appellants' App'x at 2042, 2054, 4063, 4067–68.

[14] The parties do not dispute that Indiana law applies. *See* Appellants' 5/29/12 Br. at 38.

[15] In the Underlying Litigation, the following relief was sought: The Shane class sought injunctive relief, restitution for payments wrongfully denied, delayed, or diminished (and interest due on late payments), treble damages under RICO for the amount of damages suffered by reason of payments wrongfully denied, delayed, or diminished (and interest due on late payments), punitive damages, and attorney fees against Anthem and its co-defendants, jointly and severally. In Thomas, the plaintiff class sought injunctive relief, treble damages under RICO for the amount of damages suffered by reason of payments wrongfully denied, delayed, or diminished (and interest due on late payments), and attorney fees against Anthem and its co-defendants, jointly and severally. In Levinson, the class sought declaratory and injunctive relief, both compensatory and punitive damages, and litigation expenses. The CSMS class sought declaratory and injunctive relief and litigation expenses but no other monetary damages. *See* App'x at 3663–66; 3905–06; 3958–59; and 3997–98.

the decisions of its court of last resort." Hooks SuperX, Inc. v. McLaughlin, 642 N.E.2d 514, 518 (Ind. 1994) (quoting Hogston v. Bell, 185 Ind. 536, 545, 112 N.E. 883, 886 (1916)).

This case involves a multi-million dollar multi-tiered insurance arrangement. The contracts at issue reinsure Anthem's self-insured excess policies for E&O liability. Anthem and the Excess Reinsurers are sophisticated, professional insurance companies. CNA fails to point to a declared public policy of this State that would bar Anthem's recovery because the relief Anthem seeks is contractual or restitutionary in character. We recognize that some authorities have supported the idea that a business cannot insure anticipated economic responsibility or known losses. *See* 7 *Couch on Insurance 3d*, § 101:2 n.3 (2013 Revised Edition); *see also* Town of Orland v. Nat'l Fire & Cas. Co., 726 N.E.2d 364, 371 (Ind. Ct. App. 2000) (finding that insured's deliberate business decision not to fulfill the terms of a contract was outside the scope of E&O coverage and declining the insured's "invitation to treat the Errors or Omissions Clause as a performance bond"), *trans. denied*; Conseco, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 49D13-0202-CP-348, 2002 WL 31961447 at *6 (Ind. Cir. Ct. Dec. 31, 2002) (unpublished) ("It is axiomatic that insurance cannot be used to pay an insured for amounts an insured wrongfully acquires and is forced to return, or to pay the corporate obligations of an insured."); Am. Family Mut. Ins. Co. v. Am. Girl, Inc., 673 N.W.2d 65, 85–86 (Wis. 2004) (discussing the known-loss doctrine). But, there were never any breach-of-contract claims in Shane and Thomas, and—at the time of settlement—the contract claims were gone in Levinson and CSMS. *See* Appellants' App'x at 648 ("At the time of the settlement, the only claims against Anthem were premised on violations of RICO and CUTPA"), 999. The plaintiffs also sought non-contractual and non-restitutionary damages such as punitive damages— expressly covered by the Policy under 4(a)—and damages suffered by reason of payments wrongfully denied, delayed, or diminished under joint and several liability. *See* footnote 15, *supra*. We reject CNA's request that the contract not be enforced according to its terms.

To the extent that CNA seeks to characterize the alleged acts of Anthem to deny,

11

delay, or diminish claim payments as intentional conduct, as distinguished from claims from the negligent rendering of claims handling and adjusting services, such distinction is unavailing. The language of the Policy covers intentional behavior on its face. "Wrongful Act" is defined as "any breach of duty, neglect, error, misstatement, misleading statement, omission or other act done *or wrongfully attempted*." Appellants' App'x at 852, 3447 (emphasis added). To "attempt" necessarily involves intentional behavior. CNA fails to point to a well-defined and dominant Indiana public policy prohibiting coverage for specific intentional conduct in the context of alleged systematic failure to adequately reimburse claims for medical service, versus, e.g., murder or arson to receive occurrence-based coverage. In light of the very strong presumption of enforceability of contracts, and the relative equality of sophistication and bargaining power among the parties, we decline to find the covered risks to be uninsurable under Indiana law.

### 3. Exception to Fraudulent Acts Exclusion

The paragraph listing various exclusions for Coverage II declares in part that "This coverage section does not apply . . . (b) to any dishonest or fraudulent act or omission," but then qualifies the exclusion with the exception that "this exclusion shall not apply to any Claim seeking both compensatory and punitive damages based upon or arising out of allegations of both fraud and bad faith in the rendering of or failure to render Professional Services." Coverage II, ¶5, Exclusion (b), Appellants' App'x at 852, 3447. CNA argues that the exception to Exclusion (b) is inapplicable as a matter of law. Anthem contends that the exception applies, thus obviating the exclusion.

The parties dispute whether Exclusion (b) requires a factual determination of whether a dishonest or fraudulent act or omission actually occurred. CNA points to Coverage Parts III and IV of the Policy that expressly state when coverage is affected by a "final adjudication." *See* Exclusion (o), Appellants' App'x at 859; Exclusion (e), Appellants' App'x at 861. In contrast to the exclusion in Coverage II, however, the exclusions in Coverage Parts III and IV first bar coverage for "any Claim alleging fraud, dishonesty" *and then* create an exception for dishonest/fraudulent actions "subsequently disproven by

12

a final adjudication favorable to the Insured."  Significantly, within Coverage II itself, paragraph 5 entitled "Exclusions" enumerates a list of 28 exclusions, 22 of which declare that Coverage II does not apply "to any Claim" and then describe various types of claims. Exclusion (b), however, disavows coverage not merely as to any *claim*, but rather as "to any dishonest or fraudulent *act or omission*."  *Id.* (emphasis added).  *Compare* Exclusions (a), (b), and (o) *with* (c)–(n), (p)–(s), *et seq.*  Appellants' App'x at 852–54, 3447–49. Thus the applicability of Exclusion (b) depends upon an ultimate factual determination— not necessarily a judicial one—of whether a dishonest or fraudulent act or omission actually occurred, as distinguished from a legal conclusion as to whether the relevant claim was predicated on a dishonest or fraudulent act or omission.  This necessity of a factual determination regarding whether Anthem's alleged conduct was dishonest or fraudulent defeats CNA's summary judgment argument that the exception to Exclusion (b) is inapplicable as a matter of law.

To the contrary, Anthem urges that summary judgment is appropriate to affirmatively establish that the exception to Exclusion (b) ("this exclusion shall not apply to any Claim seeking both compensatory and punitive damages based upon or arising out of allegations of both fraud and bad faith in the rendering of or failure to render Professional Services"), Exclusion (b), Appellants' App'x at 852, 3447, is satisfied in this case.  CNA disagrees, arguing the settled claims do not implicate "Professional Services" as defined in the Policy, "the RICO/CUTPA-Based Claims [in Shane, Thomas, CSMS, and Levinson] did not seek punitive damages from Anthem" and "the underlying plaintiffs did not allege 'bad faith' on the part of Anthem."  Appellants' App'x at 655.

As explained above, we reject CNA's "Professional Services" argument.  Likewise, we reject CNA's argument that the settled claims are not based on bad faith as required by the exception.  CNA argues that any claims for bad faith as required by the exception must be based upon the special relationship between an insurer and an insured, in contrast to that between an insurer acting as a managed care organization and its preferred service providers.  We disagree.  The Policy does not provide a special definition of "bad faith," and thus we construe the term in ordinary usage, wherein the phrase "bad

13

faith" is commonly understood to mean "lack of honesty and trust" and "intent to deceive." *See* THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 154 (2d ed. 1987) and 1 SHORTER OXFORD ENGLISH DICTIONARY 921 (6th ed. 2007) respectively. Looking to the ordinary usage, we are convinced that conduct warranting the settled claims constitutes bad faith. With respect to <u>Shane</u> and <u>Thomas</u>, to succeed in a RICO claim, a plaintiff must show in part a "pattern of racketeering activity" or the "collection of an unlawful debt." 18 U.S.C.A. § 1962(a). Similarly, the <u>Levinson</u> and <u>CSMS</u> plaintiffs specifically alleged breach of the duty of good faith and fair dealing, violations of the Connecticut Unfair Trade Practices Act (CUTPA) and Unfair Insurance Practices Act, and negligent misrepresentation. All these claims involve lack of honesty and trust, i.e. bad faith as generally understood.

CNA also argues the RICO-based treble damage claims in <u>Shane</u> and <u>Thomas</u> and the CUTPA-based claims in <u>CSMS</u> and <u>Levinson</u> should not be considered as seeking punitive damages. Appellants' App'x at 655. With respect to <u>Shane</u> and <u>Thomas</u>, we disagree. The nature of the treble-damage claims have the punitive effect of requiring a defendant to pay damages in excess of actual loss, and are thus punitive in nature. As to <u>Levinson</u> and <u>CSMS</u>, we partially agree with CNA. Unlike the <u>Levinson</u> plaintiffs, the plaintiff in <u>CSMS</u> sought declaratory and injunctive relief and litigation expenses—but not punitive damages.[16] Thus, with respect to <u>CSMS</u> only, the exception to Exclusion (b) does not apply as a matter of law.

We further generally note that the losses for which Anthem seeks indemnification are the result of a comprehensive settlement of a single federal multi-district litigation which collectively involved requests for all the types of relief referred to in the exception to Exclusion (b). As to monetary damages, the settlement of this litigation required Anthem to pay $198 million: $5 million contribution to a charitable foundation, $135 million into a common fund from which affected class members could seek payment, and $58 million in attorney fees. *See* Appellants' App'x at 4020, 4063, 4067–68. This single settlement shifts our focus from the nature of the individual claims to the totality of Anthem's claim settlement.

---

[16] *See* footnote 15, *supra*.

We hold that Anthem's claim of settlement losses satisfies the exemption and thus avoids the application of Exclusion (b) as a matter of law. As to the settlement losses resulting from CSMS's claims, we remand for a factual determination whether Exclusion (b) applies and, if so, the amount of attorney fees received by CSMS as a result of the settlement.[17]

### 4. Bad Faith Refusal to Provide Reinsurance Coverage

In its complaint, Anthem argued that CNA breached its duty of good faith and fair dealing by, among other acts and omissions, "taking unreasonable and unfounded positions regarding the Policy, including as to their duty to defend Anthem, and otherwise." Appellants' App'x at 3337. Anthem sought compensatory damages as well as punitive damages "to punish Defendants and to deter them and others from engaging in such conduct in the future." *Id.* at 3338. As the moving party on summary judgment, CNA argued Anthem's bad faith claim (and consequently Anthem's request for punitive damages) failed as a matter of law in part because its coverage position was reasonable. "To prove bad faith, the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability." Freidline v. Shelby Ins. Co., 774 N.E.2d 37, 40 (Ind. 2002). Further, "a good faith dispute about whether the insured has a valid claim will not supply the grounds for recovery in tort for the breach of the obligation to exercise good faith." *Id.*

To obtain partial summary judgment foreclosing Anthem's claim for punitive damages, CNA must thus establish the impossibility of Anthem showing by clear and convincing evidence that CNA's coverage denial was unreasonable and lacking in any legitimate basis. Notwithstanding the elevated burden of proof, we find that the motivations behind CNA's coverage denial are matters for consideration by the fact-finder at

---

[17] *See* footnote 13, *supra*.

trial and do not qualify for summary judgment. We reverse the grant of summary judgment in favor of CNA on this issue, and remand to the trial court for further proceedings.[18]

## Conclusion

We hold as a matter of law that Anthem's losses resulted from alleged wrongful acts that occurred solely in the rendering or failure to render Professional Services and thus fall within the Policy's insuring agreement; that the relief Anthem seeks is insurable under the Policy and Indiana law; and that, with respect to Anthem's settlement losses resulting from Shane, Thomas, and Levinson, the exception to Exclusion (b) obviates its application. Anthem is entitled to the coverage, including coverage for defense costs, under Coverage II of its policies with the Excess Reinsurers, except for its settlement losses resulting from CSMS's claims. We reverse and, except for Anthem's losses resulting from CSMS's claims and Anthem's bad faith claim, enter summary judgment in favor of Anthem for its costs of settling the Underlying Litigation and remand to the trial court for further proceedings consistent with this opinion.

Rush, C.J., and David and Massa, JJ., concur.
Rucker, J., concurs in result.

---

[18] Anthem's complaint alleged bad faith refusal to provide coverage against both CNA and Twin City. For the same reasons that we reverse the grant of summary judgment in favor of CNA on this issue, we likewise reverse the grant of summary judgment for Twin City.

AMICI CURIAE

THE AMERICAN INSURANCE ASSOCIATION,
THE NATIONAL ASSOCIATION OF MUTUAL
INSURANCE COMPANIES, AND
THE PROPERTY CASUALTY INSURERS ASSO-
CIATION OF AMERICA
John C. Trimble
Richard K. Shoultz
Lewis Wagner, LLP
Indianapolis, Indiana

Ronald P. Schiller
Hangley Aronchick Segal Pudlin & Schiller
Philadelphia, Pennsylvania

AMERICA'S HEALTH INSURANCE PLANS
Nicole J. Webb
Squire Sanders LLP
Cincinnati, Ohio

UNITED POLICYHOLDERS
Ronald G. McLean
Ronald G. McLean Law Office
Indianapolis, Indiana

Amy R. Bach
United Policyholders
San Francisco, California