In the

# United States Court of Appeals
## For the Seventh Circuit

––––––––––––––––––

No. 20-1735

REID HOSPITAL AND HEALTH CARE SERVICES, INC.,

*Plaintiff-Appellant,*

*v.*

CONIFER REVENUE CYCLE SOLUTIONS, LLC,

*Defendant-Appellee.*

––––––––––––––––––

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:17-cv-01422-JPH-TAB — **James Patrick Hanlon**, *Judge.*

––––––––––––––––––

ARGUED DECEMBER 11, 2020 — DECIDED AUGUST 11, 2021

––––––––––––––––––

Before ROVNER, HAMILTON, and SCUDDER, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Navigating health-care payment
systems is not easy, as many patients can attest. Some provid-
ers, it turns out, face their own challenges on a much larger
scale. That's why plaintiff Reid Hospital contracted with de-
fendant Conifer Revenue Cycle Solutions to handle the hospi-
tal's "revenue cycle," that is, the provider-side work of setting
up billing codes, billing, processing paperwork, and collect-
ing payments.

According to the hospital, Conifer mismanaged the revenue cycle and failed to meet its contractual obligations in a wrongful attempt to cut Conifer's own staff costs. The hospital sued for breach of contract. Conifer moved for summary judgment, arguing that even if it breached the contract, the hospital cannot recover lost-revenue damages because the contract does not allow for "consequential" damages. The district court agreed and granted summary judgment to Conifer.

We reverse and remand. Given the way Conifer framed its motion for summary judgment, we must assume that it breached the contract substantially and on a large scale. Even if lost revenue is often considered consequential, *this* contract was a contract *for revenue collection services*. The parties' contract did not define *all* lost revenue as an indirect result of any breach. Lost revenue would have been the direct and expected result of Conifer's failures to collect and process that revenue as required under the contract. The text and overall context of this complex multimillion-dollar contract for specialized services made clear that the parties did not intend to insulate Conifer entirely from damages for its breaches. Conifer also offers some alternative arguments for affirmance, but they are rife with disputed issues of fact that are inappropriate for summary judgment.

I.  *Factual and Procedural Background*

"We review a district court's summary judgment ruling de novo and consider the facts and draw all inferences in the light most favorable to the nonmoving party." *Henry v. Hulett*, 969 F.3d 769, 776 (7th Cir. 2020) (en banc). We do not vouch for the objective truth of every fact that we must assume to be true for purposes of the appeal. *Brunson v. Murray*, 843 F.3d 698, 701 (7th Cir. 2016).

Defendant Conifer Revenue Cycle Solutions is a health-care revenue cycle management contractor. It prepares, issues, and collects payment for health-care bills. Its responsibilities include extensive work both before and after billing, including managing the behind-the-scenes aspects of patients' health-care, from pre-registering patients so that their medical billing information can be processed quickly to reviewing and approving documentation upon release. Hospitals and such contractors must navigate the ever-changing web of medical billing codes and reimbursement rates for multiple third-party payors, from federal and state governments to large and small insurers and health maintenance organizations. And they do the vital tasks of collecting, processing, and transmitting payments for health-care services.

After years of managing its own billing and collections, plaintiff Reid Hospital decided that this complex and specialized work should be outsourced. It felt that it was leaving money on the table by not managing the revenue cycle efficiently. So it turned that work over to Dell Marketing L.P., also a revenue cycle management contractor.

Their contract ran 80 pages and included several appendices and exhibits to those appendices. The parties agreed that both sides' damages in a breach of contract action would be limited. Here's the language at the center of this appeal:

> Except with respect to claims resulting from the willful misconduct of Dell [or] its employees and agents … but with respect to all other claims, actions and causes of action arising out of, under or in connection with this Agreement … whether or not such damages are foreseen, neither Party will be liable for, any amounts for

> indirect, incidental, special, consequential (including without limitation lost profits, lost revenue, or damages for the loss of data) or punitive damages of the other Party or any third parties.

§ 14.1(B). Likewise, in the absence of willful misconduct or gross negligence by the contractor, Reid Hospital's direct damages are capped at the amount it has paid under the contract. § 14.1(C).

Dell recognized that Reid Hospital's revenue management needed extensive up-front investments to improve revenue collection down the line. Dell planned to invest resources up front, expecting profits further down the road. Dell's plan never took root, though, because it sold much of its revenue management portfolio to Conifer in 2012 while Dell was still losing money on the Reid Hospital contract. Conifer took over the revenue operations contract at the hospital as the assignee of Dell.

According to the hospital's evidence, Conifer immediately began cutting corners on this contract by reducing staff to a bare-bones crew and neglecting many of the duties for which they were responsible. Conifer employees found themselves overworked and in over their heads. Beyond Conifer's general inability to collect and process revenue properly with a skeletal crew, Reid Hospital claims there was a general slowdown throughout the revenue-management cycle. For example, Conifer's failure to update medical insurance charge descriptors meant that patients were later underbilled. At the other end of patient care, Conifer was slow in processing patients' discharge forms, leading to longer hospital stays that third-party payors refused to reimburse fully.

After two years of this, Conifer asked the hospital to rene-gotiate the contract, claiming that it was still losing money and needed more favorable terms. The hospital refused and opted to bring its revenue operation back in-house. The hos-pital hired another consultant to assist the transition, and that contractor found what we must assume were several signifi-cant errors in Conifer's work.

Reid Hospital then filed this suit against Conifer for breach of contract, claiming that Conifer's poor performance caused the hospital to lose tens of millions of dollars in reve-nue it should have collected. On cross-motions for summary judgment, the district court granted summary judgment to Conifer. The court read this contract as defining all claims for lost revenue as claims for "consequential damages," thus bar-ring recovery absent "willful misconduct." The court further concluded that there was no evidence of willful misconduct because Conifer showed that its decisions to cut costs were motivated by a desire to save its own money, not malice to-ward the hospital. Accordingly, the district court did not reach Conifer's alternative arguments that the hospital could not demonstrate that it had been damaged at all or that any purported damages were caused by its hypothetical breaches of contract. The court also denied as moot the hospital's mo-tion for partial summary judgment on the issue of breach.

## II. *Analysis*

We review a district court's summary judgment ruling de novo, giving the non-moving party the benefit of conflicting evidence and reasonable inferences from the evidence. *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 459 (7th Cir. 2021). Summary judgment is appropriate when "there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The essential elements of a breach-of-contract claim are "(1) a valid and binding contract; (2) performance by the complaining party; (3) non-performance or defective performance by the defendant; and (4) damages arising from defendant's breach." *Karma International, LLC v. Indianapolis Motor Speedway, LLC*, 938 F.3d 921, 926 (7th Cir. 2019), quoting *U.S. Research Consultants, Inc. v. County of Lake*, 89 N.E.3d 1076, 1086 (Ind. App. 2017). Conifer's motion assumes that it breached the parties' contract.

Businesses are of course entitled to use a contract to establish a custom-tailored set of rights, obligations, remedies, and procedures for resolving disputes. See, e.g., *Sterling National Bank v. Block*, 984 F.3d 1210, 1213–14 (7th Cir. 2021) (under Illinois law, applying "elaborate" terms of parties' stock purchase agreement); *Indiana v. IBM*, 51 N.E.3d 150, 160 (Ind. 2016) (*IBM I*) (parties may displace common-law default rules). When the contract is a product of arms-length negotiation between two sophisticated commercial entities, Indiana law generally requires that the contract be enforced as written. E.g., *SAMS Hotel Group, LLC v. Environs, Inc.*, 716 F.3d 432, 435 (7th Cir. 2013); *WellPoint, Inc. v. National Union Fire Ins. Co. of Pittsburgh*, 29 N.E.3d 716, 724–25 (Ind. 2015), modified on rehearing, 38 N.E.3d 981 (enforcing as written a multi-tiered, multimillion-dollar insurance contract between two sophisticated entities).

These businesses agreed on various changes to the common-law default rules of contracting that would otherwise govern their claim. As relevant here, Reid Hospital's contract, originally with Dell but later assigned to Conifer, caps both

direct and indirect damages (such as consequential damages) unless the hospital can show that Conifer engaged in "willful misconduct." The hospital argues that the district court erred in concluding that these negotiated limits on damages defeat its entire lawsuit.

Conifer counters that the district court's ruling should be affirmed and that it is also entitled to judgment as a matter of law on alternative grounds. First, based primarily on a parenthetical phrase following the word "consequential" mentioning "lost revenue," it reads the contract as defining all lost revenue as consequential and thus presumptively not recoverable. Second, Conifer says, the hospital cannot satisfy the exceptions for "willful misconduct" because the record shows, and common sense confirms, that Conifer cut its costs to stanch its business losses, not out of ill will toward the other party to the contract. Third, in the alternative, Conifer argues that it is entitled to summary judgment because the hospital cannot prove damages at all. Conifer claims that it *increased* the hospital's revenue during its two years of operations and says that the hospital cannot tie any specific loss to any assumed breaches.

We conclude that the district court erred in granting summary judgment on the first two theories, and we cannot affirm on the third. First, the contract does not define *all* lost revenue as indirect or consequential. Revenue was the entire point of this contract for revenue collection services. Lost revenue was the direct result of at least some breaches. Second, whatever the parties meant by "willful misconduct," a tort concept that does not have an obvious meaning in such a commercial contract, a jury could find that at least some of Conifer's assumed breaches amounted to willful misconduct. Finally, the issues

of damage and causation are rife with disputed issues of material fact.

A. *Consequential Damages*

Conifer relies upon portions of the contract that limited Reid Hospital's right to recover consequential damages in claims stemming from anything other than Conifer's willful misconduct. The key provision limiting consequential damages addressed lost revenue: "whether or not such damages are foreseen, neither Party will be liable for, any amounts for indirect, incidental, special, consequential (including without limitation lost profits, lost revenue, or damages for the loss of data) or punitive damages." § 14.1(B). Even if damages were direct (as opposed to indirect), the contract limited damages available in such claims to the fees the hospital paid under the contract in the absence of willful misconduct or gross negligence. § 14.1(C). Finally, Conifer did "not guarantee the collection of any accounts receivable." § 14.1(A).

Conifer claims that these various damage limits worked to define all lost revenue as consequential and thus not recoverable at all in the absence of willful misconduct. Conifer's reading of the parenthetical following "consequential" misunderstands the distinction between direct and indirect (e.g., consequential) damages, especially as applied to a contract *for revenue collection services*. And its other arguments cannot carry the day.

The definition of consequential damages is "elusive," "ambiguous[,] and equivocal." *Damages*, Black's Law Dictionary (11th ed. 2019), quoting Emerson G. Spies & John C. McCoid II, *Recovery of Consequential Damages in Eminent Domain*, 48 Virginia L. Rev. 437, 440–41 (1962). Then-Judge

Cardozo identified the difficulty as follows: "At the root of the problem is the distinction between general [direct] and special [indirect] damage as it has been developed in our law. There is need to keep in mind that the distinction is not absolute, but relative. To put it in other words, damage which is general in relation to a contract of one kind may be classified as special in relation to another." *Kerr Steamship Co. v. Radio Corp. of America*, 157 N.E. 140, 141 (N.Y. 1927). Applying Indiana law, we similarly explained that "the difference [lies] in the degree to which the damages are a foreseeable (that is, a highly probable) consequence of a breach." *Rexnord Corp. v. DeWolff Boberg & Associates*, 286 F.3d 1001, 1004 (7th Cir. 2002).

Other authorities draw this distinction in similar terms. According to the Restatement (Second) of Contracts, consequential damages are "recoverable for loss that results other than in the ordinary course of events." Restatement (Second) of Contracts § 351 cmt. b (1981). Williston elaborated: "Consequential damages are those damages that do not flow directly and immediately from the breach, but only from some of the consequences or results of the breach." 24 Williston on Contracts § 64:16 (4th ed. May 2021 update). In contrast, direct damages are "considered to include those damages that flow naturally from a breach, that is, damages that would follow any breach of similar character in the usual course of events." *Id.*

Unforeseeable indirect damages are not recoverable. That's the teaching of the canonical British case, *Hadley v. Baxendale*, 156 Eng. Rep. 145 (1854), which concerned a contract for timely transport of a piece of a miller's steam engine to a manufacturer for replacement. The carrier breached by delivering the crankshaft late, and the miller lost profits

because it had to shut down its engine while waiting for the replacement part. The court held that even if the carrier breached, it could not be held liable for the profits the miller would have made if it had been able to reassemble its engine and resume operations on schedule. *Id.* at 151. The court suggested, however, that if the miller had notified the carrier in advance how critical the crankshaft was to its business and losses it would suffer from a late delivery, the result could have been different. *Id.*

To be sure, lost profits and lost revenue are the classic examples of unrecoverable consequential damages from *Hadley*, but not all lost revenue is consequential by definition in all cases. Even where a class of damages is generally consequential, the ultimate determination is a relative one based on the substance and terms of the contract. E.g., *Kerr Steamship Co.*, 157 N.E. at 141 (stressing that this is a "relative" context- and contract-specific inquiry). *Hadley* was about a contract for delivery. But this is a contract for revenue collection, after all. It is not hard to see how a breach of this contract could, would, and did lead directly to lost revenue.

Indeed, courts regularly conclude that in the business service context, some lost revenues or lost profits are well within the ambit of direct damages. A good example is *Penncro Associates, Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007), where then-Judge Gorsuch's opinion affirmed an award of lost-profit damages as "direct" and not "consequential" where the breaching party had promised to refer clients to the contractor and failed to do so, causing the contractor to miss business opportunities. See also, e.g., *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1328–29 (Fed. Cir. 2002) (federal law; affirming award of lost-profit damages where breaching

government agency cancelled contract with private financier; rejecting agency's argument that profits on anticipated loans were "consequential" because in this contract, the profits would have accrued "as the direct and immediate results of [the contract's] fulfillment") (citation and quotation marks omitted); *ViaStar Energy v. Motorola, Inc.*, 2006 WL 3075864, at *4–5 (S.D. Ind. Oct. 26, 2006) (Indiana law; denying summary judgment on damages notwithstanding contractual exception for recoupment of "consequential" damages; failure to deliver key products or otherwise abide by the contract could result directly in lost profits); see also *IBM v. Indiana*, 112 N.E.3d 1088, 1098–1101 (Ind. App. 2018) (*IBM II*), affirmed in relevant part, 138 N.E.3d 255 (Ind. 2019) (one class of damages, though sometimes indirect, was actually direct under the terms of contract for business services); *Computrol Inc. v. Newtrend, L.P.*, 203 F.3d 1064, 1071 n.5 (8th Cir. 2000) (Illinois law) (dicta), citing *Moore v. Boating Industry Ass'ns*, 754 F.2d 698, 717 (7th Cir. 1985), vacated on other grounds, 474 U.S. 895 (1985) ("We are not convinced that the … restriction on 'special, incidental, or consequential damages,' standing alone, precludes the recovery of lost profits…. Thus, it is incorrect to classify mechanically the prospective lost profits portion of Computrol's damage award as consequential damages.").

Parties may, of course, negotiate for idiosyncratic definitions of ordinary phrases. E.g., *IBM I*, 51 N.E.3d at 160. As then-Judge Gorsuch wrote for the Tenth Circuit, "Up may be defined as down, right as left, day as night." *Penncro*, 499 F.3d at 1157; see also *AM International, Inc. v. Graphic Mgmt. **Associates***, 44 F.3d 572, 576 (7th Cir. 1995) ("If the parties agree to an idiosyncratic meaning, the court will honor their agreement."). That's what Conifer claims happened here: the parties decided to redefine the term "consequential damages" to

include *all* lost revenue, including any such damages that directly flowed from a breach. For support, Conifer relies on the parenthetical following the bar on consequential damages, "including without limitation … lost revenue."

Properly understood, this parenthetical reference to "lost revenue" did not foreclose collection of *all* lost revenue—just revenue that was lost as an *indirect* result of Conifer's breach. This is apparent from the face of the contract, which did not list "lost revenue" separately as nonrecoverable. Instead, the contract included lost revenue in a parenthetical following the word "consequential" within a discussion of various types of indirect damages.

The question is how to interpret the parties' decision to include the phrase "lost revenue" adjacent to a list of subsets of indirect damages. In *Penncro*, the Tenth Circuit examined a similar contract and found that such an aside did not categorically foreclose the collection of lost revenue or lost profits that resulted directly from breach. 499 F.3d at 1156. The placement of "lost revenue" within a discussion of consequential and indirect damages indicates that the reference to "lost revenue" was not necessarily to all lost revenue but only that which can be determined on some other basis to be consequential rather than direct. *Id.* at 1156–57.

*Penncro* is well reasoned, and we believe that Indiana courts would agree. See *Sutula-Johnson v. Office Depot, Inc.*, 893 F.3d 967, 971 (7th Cir. 2018) ("Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), our role is to decide questions of state law as we predict the [state] Supreme Court would decide them."); *IBM II*, 112 N.E.3d at 1100–01 (taking contract-specific approach to whether damages were direct).

In explaining its holding in *Penncro*, the Tenth Circuit provided a useful analogy that we find persuasive and present here (albeit modified to account for each side's attempt to manipulate the analogy to its advantage). Consider a cardiologist who instructed a patient to "avoid all fried foods, including, without limitation, all fruits and vegetables." The doctor merely clarified that though Popeye eats spinach and an apple a day keeps the doctor away, spinach fritters and fried apple-pie must still be avoided. Likewise, the doctor did not discourage eating all fruits and vegetables, just those that were fried. So too here—the contract bars not all lost-revenue damages but only those lost-revenue damages that properly fall within the category of "consequential" damages. See *Penncro*, 499 F.3d at 1156.

Conifer counters the *Penncro* analogy by arguing that we should instead imagine a cardiologist instructing a patient to "avoid all unhealthy foods, including, without limitation, steak and pizza." Conifer's example does not match its textual argument, which asserts that the parenthetical *redefined* the term "consequential damages" to have an unusual contract-specific meaning. As we've said, parties are, of course, free to set up their own bespoke legal universe adopting idiosyncratic or counterintuitive definitions for everyday terms. But the fact that they *could* does not mean that they *did*.

In fact, these sophisticated parties agreed on a glossary of 66 contract-specific terms and phrases in a "Certain Definitions" subsection (not to mention other definitions included in the appendices). The supposed redefinition of "consequential" was not in any of these sections. In other words, Conifer's best argument is that the proposed special definition was not in the Definitions but merely implied by a parenthetical

phrase in an out-of-the-way subsection. That simply was not a clear indication that the parties agreed to depart from the ordinary meaning of "consequential," so we apply the ordinary definition. See *Penncro*, 499 F.3d at 1157, citing Corbin on Contracts § 24.8, and Restatement (Second) of Contracts §202(3)(a); *WellPoint*, 29 N.E.3d at 721.

The better reading of this lost-revenue parenthetical, which takes into account the actual meaning of the phrase "consequential damages," is that it bars recovery of lost revenue that would have flowed indirectly from breach even if such damages otherwise could be recovered under the *Hadley* rule. Because this was a contract for revenue collection services, however, at least some of the lost revenue at issue here could have flowed directly from the breaches. See *Penncro*, 499 F.3d at 1157; *Energy Capital Corp.*, 302 F.3d at 1328–29; see also *Kerr Steamship Co.*, 157 N.E. at 141 (distinction between consequential and direct damages hinges on context and substance of contract).

Conifer attempts to distinguish this case from *Penncro* on the ground that this contract contained a phrase that becomes redundant under the hospital's reading: that indirect damages are barred "whether or not such damages are foreseen." This phrase would be redundant, says Conifer, because unforeseeable indirect damages can never be recovered under the *Hadley* rule; if that phrase had been deleted, the overall meaning of damages limitation in the contract would not change.

We pause at the outset to note that this is an extremely narrow alleged redundancy; calling these seven words a redundancy at all overstates any possible problem. There is a difference between interpreting interlocking and separate

provisions of a legal text to avoid redundancy, e.g., *In re Southwest Airlines Voucher Litigation*, 799 F.3d 701, 710 (7th Cir. 2015), and attempting to assign special significance to a less-than-concise aside, e.g., *White v. United Airlines, Inc.*, 987 F.3d 616, 622 (7th Cir. 2021) (not assigning special weight to presence of allegedly verbose and superfluous parenthetical). Nonetheless, Conifer advances a broad reinterpretation of this contract section that would give a distinct effect to this redundant phrase—but not much else. Conifer asserts that, properly interpreted, this damage limit defined *all* damages, including even direct damages, as "indirect" and therefore not recoverable without a showing of willful misconduct. The district court accepted this creative argument, but the anti-redundancy canon should not have been given such controlling weight.

For starters, Conifer's reinterpretation of this provision does not solve the redundancy problem but actually makes it much worse. Conifer claims that this contract redefined the broad categories of "direct" and "indirect" damages, with the distinction between the two erased entirely by making *all* damages "indirect." See Dkt. 139 at 9 ("In short, what Indiana law would otherwise split between direct and consequential damages based on foreseeability, the Agreement lumps into consequential damages."). But this interpretation would render the contract's delineations of all the different types of excluded indirect damages superfluous and quite perplexing. If we were to accept the theory that the parties agreed to define "direct damages" as a null set, that would render the entire section entitled "Limitations on Direct Damages" superfluous as well.

The anti-surplusage canon, like all textual canons, has its limits, and that particular canon is especially prone to excessive use. We have recognized that "the presence of some redundance is rarely fatal on its own to" the meaning of a legal text. *White*, 987 F.3d at 622. It is well known that drafters of legal documents often consciously adopt a "belt-and-suspenders approach" to try to capture the universe. *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 465 (7th Cir. 2020) (Barrett, J.), quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176–77 (2012); *Sterling National Bank*, 984 F.3d at 1218, citing Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—an Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I*, 65 Stan. L. Rev. 901, 934 (2013). Conifer's ability to find a purported redundancy in this 80-page contract is thus not a "deal-breaker." *Gadelhak*, 950 F.3d at 465; accord, e.g., *Rimini Street, Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019) (alleged statutory redundancy not a "silver bullet").

Conifer's reliance on the anti-redundancy canon also loses sight of the meta-canon for the interpretation of legal texts: "no canon of interpretation is absolute." Scalia & Garner, *Reading Law*, at 59. Conifer thus overemphasizes one canon and fails to account for two others that clearly apply here and that strongly counsel a different meaning: ordinary meaning and whole text.

"In the case of a written contract, the parties' intent is determined by looking first to the plain and ordinary meaning of the contract language." *BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 359 (7th Cir. 2009), citing among other cases *USA Life One Insurance Co. v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997); see also Scalia & Garner, *Reading Law*, at

69 ("Words are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense."). Here, in laypersons' terms, the contract said that consequential damages were not recoverable even if they were actually foreseen.

Conifer's suggestion that the contract defined all damages as consequential and thus nonrecoverable because they are either foreseeable or not foreseeable has no basis in the language in question. The anti-redundancy canon is strongest where "one possible interpretation of a [legal text] would cause some redundancy and another" would not. *Rimini Street*, 139 S. Ct. at 881. It is at best a "clue as to the better interpretation," not a wholesale invitation to rewrite a contract. *Id.* (refusing to rewrite statute to avoid alleged minor redundancy).

Conifer's proposed reading is especially troubling because it ignores the overall structure and context of this contract—as we cannot help repeating—for *revenue collection services*. See *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 762 (7th Cir. 2015) (Indiana law; requiring that separate contract terms be read "holistically and harmonized"); Scalia & Garner, *Reading Law*, at 167 ("The text must be construed as a whole."). Reid Hospital paid Conifer millions of dollars to do the hundreds of tasks and subtasks that go into collecting revenue. At a minimum, Conifer's failure to collect, process, and transmit revenue properly could directly cause revenue to be lost. Revenue is the point of this contract for *revenue collection services*, upon which Reid Hospital was utterly dependent.

"Rather than try 'to avoid surplusage at all costs,' we interpret" the contract "in light of its text and place within a comprehensive [] scheme." *Guam v. United States*, 141 S. Ct.

1608, 1615 (2021), quoting *United States v. Atlantic Research Corp.*, 551 U.S. 128, 137 (2007). There is no persuasive indication, textual or otherwise, that these sophisticated parties intended to leave Reid Hospital without *any* remedy for *any* breaches that did not rise to the ill-defined level of "willful misconduct." Conifer's interpretation of this contract would allow it to collect and keep millions of dollars in fees while turning the contract's core obligations into mere suggestions that could be ignored or performed sloppily with impunity.

Finally, Conifer's assertion that it should be immunized from all mine-run breach of contract suits is, as a practical matter, highly improbable and divorced from business realities. We have often said that business contracts should be interpreted with a healthy dose of common sense to avoid reaching nonsensical results. For example, "business contracts of the kind involved here[] are not parlor games but the means of getting the world's work done.... True, parties can contract for preposterous terms. If contract language is crystal clear or there is independent extrinsic evidence that something silly was actually intended, a party may be held to its bargain, absent some specialized defense." *Indianapolis Airport Authority v. Travelers Property Casualty Co. of America*, 849 F.3d 355, 368 (7th Cir. 2017), quoting *Rhode Island Charities Trust v. Engelhard Corp.*, 267 F.3d 3, 7 (1st Cir. 2001).

Conifer asserts that its interpretation would still leave some damages recoverable by Reid Hospital, but its example of compensable damages is fantastic and convoluted. Conifer hypothesizes that Reid Hospital could sue for breach of contract if a Conifer employee (a back-office accountant, say) somehow stumbled into an equipment storage room and destroyed some expensive medical equipment. With respect,

even if what Conifer describes would be a breach of this business services contract, cf. *Rexnord*, 286 F.3d at 1005 (where a business services contractor "came into [plaintiff's] plant and messed things up," damages may lie in tort), that is a highly improbable reading of this 80-page multimillion-dollar contract for specialized revenue collection services. The suggestion that the parties drafted the contract to ensure that damages would be available for that improbable scenario but to bar any meaningful accountability for the central purpose of the contract borders on the absurd. See *Nuckolls*, 682 N.E.2d at 539 (avoiding an absurd reading of an insurance contract that would have denied coverage based on arbitrary criteria).

To the extent that there is any remaining lacuna in the contract language, the baseline default rules in the common law of contracts counsel the same result. Reid Hospital paid millions of dollars for Conifer to collect revenue for the care it provided. Conifer says that the parties agreed that Reid Hospital would effectively waive damages resulting from Conifer's nonperformance absent extraordinary circumstances. That reading creates structural problems with the contract, such as Conifer's seemingly illusory promises to perform and the lack of mutuality in the bargain. E.g., Restatement (Second) of Contracts, § 351, cmt. a ("courts are often asked after the fact not to enforce such provisions [limiting consequential damages] and may construe a provision narrowly or find it unenforceable because of lack of bargain, bad faith, unconscionability or public policy").

Conifer also asserts that the no-guarantee clause shields it from any lawsuits regarding lost revenue: "*No Guarantee of Collection*. The Services provided by Dell under this Agreement do not guarantee the collection of any accounts

receivable." § 14.1(A). This sentence protected Conifer from claims based on failures to collect any particular account. Conifer's argument misunderstands the no-guarantee clause, as its disclaiming of collecting any specific revenue did not enable Conifer to breach without consequence.

As a final note on this point, the district court held that even if the standard definition of consequential damages applied in this contract, two sets of claimed damages—costs associated with increased "Length of Stay" and post-termination consulting fees—were wholly consequential to breach. We are not confident that this conclusion was correct. The district court's order did not address some potentially material factual wrinkles with both classes of damages.

The hospital seeks repayment for losses from patients' increased lengths of stay in the hospital, reasoning that Conifer took so long to process patients' billing information and paperwork that the patients stayed in their beds longer than necessary. As a result, the hospital had to cover those extra costs out of its own pocket. The district court held that Conifer's assumed breaches could not have directly caused increased lengths of stay because patient discharge decisions are made by doctors. But the hospital argues that Conifer employees processed discharge paperwork improperly or slowly *after* the doctors had signed it.

There are similar factual issues related to fees the hospital paid to a new outside consultant. The district court found that these costs were not direct damages because fees for post-hoc assessments of a prior contractor's performance do not necessarily flow from breach. But the hospital claims that the new contractor also did some of the work that Conifer was supposed to have done under the contract but did not. That

sounds like "cover," which can be recoverable as a form of direct damages. See *IBM II*, 112 N.E.3d at 1100–01 (costs of "reprocurement" were direct damages under the terms of a contract for business services); cf. *BRC Rubber & Plastics Inc. v. Continental Carbon Co.*, 981 F.3d 618, 634 (7th Cir. 2020) (Indiana law; applying Uniform Commercial Code's allowances for recovering costs of "cover" in sales of goods).

To be clear, we do not address the relative merits of the parties' arguments on these subclasses of damages, either as to whether there are disputed facts or how the law should be applied to those facts. Rather, the district court's misapprehension of the relationship between direct and indirect damages, combined with the factual wrinkles in these sub-classes of damages, gives us pause. We will not resolve these layered factual and legal issues on appeal when remand is necessary in all events. See *CPL, Inc. v. Fragchem Corp.*, 512 F.3d 389, 393 (7th Cir. 2008).

B. *Willful Misconduct*

Even under Conifer's interpretation, the contract left room for lost-revenue damages caused by "willful misconduct." The district court held that Conifer's (assumed) breaches of the contract did not rise to the level of "willful misconduct" because it was motivated by its own financial self-interest, not animus toward the hospital. The issue of willful misconduct is likely to arise again on remand because the hospital is seeking direct damages in excess of the contract price, and some of the damages it seeks might properly be deemed "consequential." See §14.1(B) and (C). The district court's grant of summary judgment to Conifer on this issue conflicts with the Rule 56 standard because there are genuine factual disputes

as to whether Conifer's breaches amounted to willful misconduct as that term is used by Indiana courts.

The parties' use of "willful misconduct," a concept from tort law, in this contract for business services strikes us as at best an awkward fit. State of mind plays an important role in tort law. Consider the fundamental divide between negligent and intentional torts. Or consider the standards for punitive damages in tort cases, which ordinarily require intentional or at least reckless wrongdoing. In contract law, by contrast, courts typically do not consider the state of mind of the breaching party. E.g., *Vernon Fire & Casualty Insurance Co. v. Sharp*, 349 N.E.2d 173, 180 (Ind. 1976) ("a promisor's motive for breaching his contract is generally regarded as irrelevant"); see generally Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 458, 462–64 (1897) (anticipating separation "between legal and moral ideas" in contract law). Courts might assume that breaches are deliberate, but ordinarily that does not matter. A breach is a breach, based on objective standards of performance.

The concept of "efficient breaches" highlights the problem. Contract law has evolved to encourage, or at least to tolerate, deliberate breaches when the breaching party will come out ahead financially if it both breaches and pays the other party damages. See *BRC Rubber*, 981 F.3d at 632. Given this background, it is not obvious what would count as willful misconduct under this contract. Still, the parties chose to write their contract this way, so we have tried our best to understand what they intended.

In Indiana law, willful misconduct is a concept used most often in personal-injury torts and in several Indiana statutes governing tort liability, as well as in unemployment

compensation and worker's compensation cases. For example, willful misconduct is an exception under the Indiana Guest Statute that could allow a passenger to recover for injuries caused by a driver of the same vehicle. E.g., *Sharp v. Egler*, 658 F.2d 480, 485 (7th Cir. 1981); *Obremski v. Henderson*, 497 N.E.2d 909, 911 (Ind. 1986) (under Guest Statute, "'wanton and willful' and 'reckless' seem to imply the same disregard for the safety of others"); *Williams v. Crist*, 484 N.E.2d 576, 578 (Ind. 1985) (drunk driver whose driving causes accident engages in wanton and willful misconduct under Indiana Guest Statute); see generally Ind. Code § 34-30-11-1(1) (current codification of Guest Statute).

"Willful misconduct" by a defendant could also overcome an otherwise ironclad defense of contributory negligence (before Indiana adopted a modified comparative fault standard in negligence cases). E.g., *McKeown v. Calusa*, 359 N.E.2d 550, 553 (Ind. App. 1977) ("contributory negligence is no defense when injuries are wilfully inflicted," and rule includes conduct "variously labeled 'constructive wilfulness,' 'wanton' or even 'reckless.'").

Similarly, an employee's misconduct could provide just cause for firing, without unemployment compensation benefits, if the misconduct was willful. See *Stanrail Corp. v. Review Bd. of Dep't of Workforce Development*, 735 N.E.2d 1197, 1203 (Ind. App. 2000) (fired employee ineligible for benefits for "wanton or willful disregard of the employer's interests, a deliberate violation of the employer's rule, or wrongful intent"), quoting *Merkle v. Review Bd. of Indiana Employment Sec. Div.*, 90 N.E.2d 524, 526 (Ind. App. 1950) (affirming denial of benefits where employee's chronic absenteeism showed "wilful disregard of the employer's interests"). And "willful

misconduct" has been a core concept in Indiana's worker's compensation system for more than a century. See *DeMichaeli and Associates v. Sanders*, 340 N.E.2d 796, 805 (Ind. App. 1976); *id*. at 806–07 (opinion of White, J.) (tracing history of statutory amendments regarding willful misconduct and self-inflicted injuries).[1]

In a relatively recent treatment of the concept, the Indiana Supreme Court explained that willful misconduct can include either "an intentional act done with reckless disregard of the natural and probable consequence of injury to a known person under the circumstances known to the actor at the time," or "an omission or failure to act when the actor has actual knowledge of the natural and probable consequence of injury and his opportunity to avoid the risk." *Witham v. Norfolk and Western Ry. Co.*, 561 N.E.2d 484, 486 (Ind. 1990) (reversing summary judgment for defendant railroad; evidence would support finding that railroad's failure to repair defective warning signal was willful, wanton, or in reckless disregard for motorists' safety, thus defeating defense of contributory negligence). The defendant must "have knowledge of an impending danger or consciousness of a course of misconduct calculated to result in probable injury," and "the actor's conduct must have exhibited an indifference to the consequences of his conduct." *Id.*

---

[1] Complicating matters a bit, the Indiana cases often refer to willful and/or wanton misconduct without parsing differences between them. See generally *Cheek v. Hamlin*, 277 N.E.2d 620, 626–27 (Ind. App. 1972) ("wanton" and "willful" are frequently synonyms but not always). Our purpose here, however, is not to test the boundaries of Indiana tort or statutory law, but to understand how to apply the contractual exceptions for "willful misconduct" to damage caps that would otherwise apply.

In a case applying the Guest Statute, we reviewed the contours of "willful misconduct" under Indiana law:

> Indiana's courts have defined wanton or wilful misconduct as "the conscious and intentional doing of a wrongful act or omission of a duty, with reckless indifference to consequences, under circumstances which show that the doer has knowledge of existing conditions and that the injury will probably result." *Brown v. Saucerman*, 237 Ind. 598, 619, 145 N.E.2d 898, 907 (1957) (quoting *Becker v. Strater*, 117 Ind. App. 504, 506, 72 N.E.2d 580, 581 (1972)). The Indiana Supreme Court has held that
>
>> (T)he gravamen of an actionable guest act case that distinguishes it from actions not under its purview is the mental attitude of the host driver when the misconduct occurs. Such attitude with respect to both his driving and his guest must have been one adverse to the welfare of the guest.
>
> *Andert v. Fuchs*, Ind., 394 N.E.2d 931 (1979). As the Indiana appellate courts note, "This does not mean that the wrongful conduct of the driver must be motivated by malice, ill will or intent to injure." *Cheek v. Hamlin*, 150 Ind. App. 681, 277 N.E.2d 620 (1972) (quoting *Mazza v. Kelly*, 147 Ind. App. 33, 258 N.E.2d 171 (1970)). Rather, it is sufficient that the appellee has been "motivated by a desire to assert himself or his

> interests above or beyond, or in reckless indif-
> ference for, the safety of his guests." *Clouse v.
> Peden*, 243 Ind. 390, 186 N.E.2d 1, 4 (1962) (quot-
> ing Judge [Achor's] concurring opinion in
> *Brown v. Saucerman*, 237 Ind. at 619). See also
> *Fuller v. Wiles*, 151 Ind. App. 417, 280 N.E.2d 59,
> 62 (1972).

*Sharp*, 658 F.2d at 485. For present purposes, the key points from *Sharp* are from the last quoted paragraph: that the plaintiff need not prove malice, ill will, or intent to injure, and that it is sufficient if the wrongdoer was motivated by a desire to put his own interests above those of the other party.[2]

Conifer argues that its evidence shows that it was working hard on the Reid Hospital account and kept trying to improve performance while also controlling its own costs on an unprofitable account. The district court agreed. We agree that the evidence could be read that way. On review of summary judgment, though, the hospital receives the benefit of conflicts in the evidence and any reasonable inferences in its favor. The evidence could also support reasonable inferences that

---

[2] Conifer argues that *Sharp* actually supports its position because it noted that under Indiana appellate court decisions, "intoxication of a driver by itself is usually not evidence of 'wanton and wilful misconduct' within the meaning of the guest statute," even though "drunk driving is so serious and dangerous an offense that it should amount to gross negligence, or wanton or wilful misconduct." *Sharp*, 658 F.2d at 485 & n.7. Conifer reasons that if driving drunk and causing an accident does not meet that bar, its assumed mismanagement of a business contract should not either. Soon after *Sharp*, however, the Indiana Supreme Court clarified that evidence of drunk driving by itself is enough to sustain a finding that the driver engaged in willful or wanton misconduct. See generally *Williams*, 484 N.E.2d at 578.

Conifer knew it was stuck with this unprofitable contract (out of the larger portfolio it acquired) and that it made obviously inadequate efforts to perform while trying to minimize its own out-of-pocket expenses, and that its managers recognized that their choices to cut Conifer's own costs were probably going to reduce revenue for the hospital.

Again, willful misconduct does not require intent to harm; knowledge of probable harm may be enough. And evidence from which a factfinder could infer knowledge of the probable harm is enough to survive summary judgment. See *Witham*, 561 N.E.2d at 486; *Clouse*, 186 N.E.2d at 4–5; see also, e.g., *Scott v. Sunrise Healthcare Corp.*, 195 F.3d 938, 941 (7th Cir. 1999) (summary judgment inappropriate where evidence would allow inference that a decision-maker had knowledge of a critical fact).

Conifer's "willful misconduct" case, *Sportsdrome Speedway v. Clark*, 49 N.E.3d 653 (Ind. App. 2016), does not conflict with this reasoning. That case involved an accident where a race car spun off a racetrack and hit a civilian volunteer in an under-protected area. The court affirmed summary judgment for the defendant racetrack on whether its failure to protect that part of the track constituted willful misconduct, reasoning that the accident in question was a freak accident. *Id.* at 661–62. Because an accident of that nature and severity was unforeseen, a factfinder could not infer that the defendant made a conscious decision to disregard a known risk, so there was no willful misconduct.

By comparison, this case involves not a one-off mistake or freak accident, but a course of conduct over many months in the face of the hospital's complaints about understaffing, giving Conifer knowledge of the problem and the probable

consequences of its course of action. See *Witham*, 561 N.E.2d at 486 (repeatedly ignoring complaints and warnings about unrealized but probable danger can be willful misconduct); see also *Jones v. Motley*, 309 N.E.2d 173, 176–77 & n.2 (Ind. App. 1974) (noting cases where poor driving constituted willful misconduct because a defendant continued on dangerous course despite a passenger's warning); *Kahan v. Wecksler*, 12 N.E.2d 998, 1000 (Ind. App. 1938) (applying similar Illinois guest statute and citing Indiana cases to effect that continuous or persistent course of conduct could be deemed willful and wanton), quoting *Armstrong v. Binzer*, 199 N.E. 863, 868 (Ind. App. 1936) (affirming plaintiff's verdict under Indiana Guest Statute where defendant-driver persisted in dangerous conduct despite warnings).

Conifer also challenges the concept of willful misconduct generally, arguing that its breaches cannot have been willful misconduct if it was motivated by consideration for its own bottom line. Conifer claims that it had been losing money despite understaffing the contract and that it chose to cut staffing to try to break even or at least reduce its losses. Conifer says these were business decisions that were "efficient" from the internal perspective of the firm.

The first problem with this "efficient breach" argument is that it is not built upon Indiana case law on "willful misconduct." Recall that, as we summarized in *Sharp*, it can be sufficient that the wrongdoer was motivated by a desire to put his own interests above those of the other party. 658 F.2d at 485, citing *Clouse*, 186 N.E.2d at 4.

Second, Conifer's argument also misunderstands the theory of efficient breach and how it relates to this contractual exception for willful misconduct. Contract law, especially in

commercial settings, encourages or at least tolerates breaches that are economically efficient so long as the non-breaching party is made whole (net of transaction costs). *BRC Rubber*, 981 F.3d at 632 (collecting authorities). Conifer is correct that this principle sits oddly with the bargained-for exception for willful misconduct in this contract: the theory of efficient breach posits that the willful breach of a contract does not carry with it the moral connotations of the term "misconduct."

But the parties here are sophisticated and chose to include an exception to this understanding, just as they also departed from the ordinary default rules for computing damages to begin with. Even if the "willfulness" of a breach is ordinarily irrelevant in determining damages, the parties here opted to change that rule. They agreed that willful breaches of *this* business contract *should* be treated differently. If Conifer, entrusted with the responsibility of collecting Reid Hospital's revenue, chose to breach while disregarding the probable (nearly certain) harm to the hospital, its conduct could be deemed willful misconduct for the reasons discussed above. See also *IBM I*, 51 N.E.3d at 160 (where parties' contract provides rule that conflicts with background principle of contract law, the contract language wins out).

In all events, efficient breach is not a shield from the normal rules of contract damages. It merely absolves a breaching party of the moral stain of, and additional punishment for, breaking a promise. *BRC Rubber*, 981 F.3d at 632. An efficient breacher still needs to make the non-breaching party whole. See *Northern Indiana Public Service Co. v. Carbon County Coal Co.*, 799 F.2d 265, 279 (7th Cir. 1986) (explaining how a so-called efficient breach might work in practice). Even if Conifer

had shown that its internal costs outweighed Reid Hospital's millions in alleged damages, then Conifer should simply pay the damages and pocket the savings from its non-performance.[3]

Conifer raises other factual issues it claims would justify affirmance, but they are inappropriate for resolution on appeal. Conifer claims that Reid Hospital waived any factual argument because it did not cite any evidence before the district court tying Conifer's knowledge of probable harms to its decision to breach. But Reid Hospital's brief did have a factual recitation about Conifer's knowing misdeeds, and Conifer even complained about the length of this section in response. See Dkt. 115 at 9, quoting Dkt. 95 at 15 ("Reid devotes more than fifteen pages of its Brief to a section about Conifer's alleged 'conscious understaffing of Reid's revenue cycle.'").

Conifer asserts that the undisputed facts show that there was no willful misconduct, citing various cross-referenced summary judgment exhibits. But a factfinder could conclude that the evidence considered in the district court's summary judgment order, taken in the light most favorable to the hospital, fits the proper definition of willful misconduct. For example, the district court recounted that the contract was under-resourced and underperforming under Dell, and that Conifer then cut staff and resources even further after assuming

---

[3] On this summary judgment record, there are further reasons to question Conifer's business-necessity narrative. Conifer acquired the Reid Hospital contract from Dell as part of a larger book of business. At the time of the acquisition, Reid Hospital's contract was losing money but most of the others were not. Taking these facts in the light most favorable to the hospital, Conifer has not shown as a matter of law that it was losing money from its assumption of the Reid Hospital contract.

the contract, and did so despite Reid Hospital's complaints and the threat posed by poor revenue collection.

Even more to the point, the district court cited an email thread among several Conifer executives noting the need to add staff to meet the contract's performance standards but declining to do so because of internal budget pressures. A rational factfinder could conclude that those decision-makers exhibited the sort of "arrogant recklessness" to the probable harm to the hospital that can support a finding of "willful misconduct" under Indiana law. See *Clouse*, 186 N.E.2d at 4 (reversing directed verdict for driver where driver ignored passenger's pleas to slow down). And even if there were no direct evidence of Conifer executives' respective states of mind over the course of its poor contract performance made worse by further staff cuts, a factfinder could infer that they knew that cutting staff would probably cause serious financial harm to the hospital. That is enough to survive a motion for summary judgment. See *Scott*, 195 F.3d at 941; *Witham*, 561 N.E.2d at 486.

Finally, Conifer argues that it was not a malefactor at all—that in fact it deserves praise because it remained responsive to Reid Hospital, operated this contract at a loss, and did everything it could to remediate staffing problems that were beyond its control. Conifer cites Reid Hospital executives' praise of its work. The hospital counters with evidence of complaints. We cannot weigh Conifer's citations to plaudits against Reid Hospital's citations to reproach. Conifer's defense along these lines must wait for trial. For now we must view the record in the light most favorable to the hospital.

C. *Causation and Damages*

In the alternative, Conifer urges us to affirm on grounds that the district court did not reach. Briefly, Conifer argues that even if we assume a breach, the hospital cannot show that it was damaged at all or that Conifer's breach caused any damages. Conifer highlights an analysis commissioned by the hospital showing that Conifer increased Reid Hospital's revenue by one to two percent during its contract term. Conifer also argues that the hospital's damages and causation theories are too speculative because it may have been reimbursed for some of the money that it now claims it never received and cannot tie each dollar to specific breaches. The hospital counters that it need not approach its damages calculations with a surgeon's precision to defeat a motion for summary judgment. It says that it has met its burden by showing that after Conifer assumed the contract, the standard of performance (and revenue collected) fell on key metrics.

We are not persuaded that the judgment can be affirmed on these intertwined factual and legal arguments. Our review of the summary judgment record shows plenty of material factual disputes, so a blanket affirmance would be inappropriate. See *International Financial Services Corp. v. Chromas Technologies Canada, Inc.*, 356 F.3d 731, 740 (7th Cir. 2003). It's disputed facts all the way down. For example, the parties' appellate briefs debate the meaning and import of an email chain (as interpreted in light of deposition testimony, revenue reports, et cetera) about five million dollars that Reid Hospital claims was uncollected because of Conifer's assumed breach. This money, moreover, is part of a larger subset of alleged damages (one of many) that is also disputed based on different revenue reports, emails, and deposition testimony.

Conifer's claim that it increased Reid Hospital's revenue also does not resolve the case. According to the Reid Hospital employee who performed this accounting, he adopted Conifer-friendly assumptions in his analysis and found conflicting evidence of growth and loss. Conifer's reliance on this evidence also suffers from a more basic fault. Is one to two percent revenue growth over two years a lot or a little? Is the relevant baseline for comparison the collections established by Reid Hospital's own underperforming in-house operation? By Dell before Conifer took over the contract? As compared to well-known trends in medical cost inflation? In exchange for millions of dollars in fees? The one to two percent increase, assuming it is correct, does not conclusively resolve the merits of the case. These are questions for trial.

The judgment in favor of Conifer is REVERSED and this case is REMANDED for proceedings consistent with this opinion.